ENTER NO JS-6 SEND

THIS CONSTITUTES NOTICE OF ENTRY
AS REQUIRED BY FRCP, RULE 77(d).



FILED
CLERK, U.S. DISTRICT COURT

FILED
DEC 16 2002
2002

CENTRAL DISTRICT OF CALIFORNIA
BY                                    DEPUTY

ENTERED
CLERK, U.S DISTRICT COURT

DEC 18 2002

CENTRAL DISTRICT OF CALIFORNIA
BY                                    DEPUTY

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| GLOW INDUSTRIES, INC., a California corporation,<br><br>                    Plaintiff,<br><br>          vs.<br><br>JENNIFER LOPEZ, COTY, INC., a corporation and DOES 1-20, inclusive,<br><br>                    Defendants. | CASE NO. CV 02-06167 MMM (PJWx)<br><br>ORDER DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION |

On August, 7, 2002, plaintiff Glow Industries, Inc. ("Glow, Inc.") filed this action against defendants Jennifer Lopez and Coty, Inc., alleging trademark infringement, trademark dilution, and federal, California statutory and common law unfair competition. Glow, Inc. has sold bath and body products under the mark GLOW since 1999, and has filed an application for federal registration of the mark that it contends is in the final stages of approval. Glow, Inc. asserts that defendants have infringed the GLOW mark by initiating national sales, promotion, and advertising of an eau de toilette, lotion, and shower gel under the name "Glow by J.Lo." Glow, Inc. seeks a preliminary injunction restraining defendants from making further use of the GLOW mark pending trial on the merits.

# I. FACTUAL BACKGROUND[1]

Plaintiff Glow Industries, Inc., a California corporation, first used the GLOW mark in commerce on February 28, 1999, in connection with the sale of "fragrant bath and body products."[2] It applied for a federal trademark on GLOW on April 29, 1999.[3] Terry Williamson, the founder and President of Glow, Inc., states that she "named the product line GLOW because

---

[1]District courts have discretion to consider otherwise inadmissible evidence in ruling on an application for temporary restraining order or preliminary injunction. See *Sierra Club v. F.D.I.C.*, 992 F.2d 545, 551 (5th Cir. 1993) ("at the preliminary injunction stage, the procedures in the district court are less formal, and the district court may rely on otherwise inadmissible evidence, including hearsay evidence. Thus, the district court can accept evidence in the form of deposition transcripts and affidavits" (citations omitted)); *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1363 (9th Cir. 1988) ("It was within the discretion of the district court to accept this hearsay for purposes of deciding whether to issue the preliminary injunction"); *Flynt Distrib. Co., Inc. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984) ("The Harveys argue that Flynt's evidence is hearsay. The urgency of obtaining a preliminary injunction necessitates a prompt determination and makes it difficult to obtain affidavits from persons who would be competent to testify at trial. The trial court may give even inadmissible evidence some weight, when to do so serves the purpose of preventing irreparable harm before trial"); *Gerling Global Reinsurance Corp. of America v. Quackenbush*, Nos. Civ. S-00-0506WBSJFM, Civ. S-00-0613WBSJFM, CIV S-00-0779WBSJFM, Civ.S-00-0875WBSJFM, 2000 WL 777978, * 3, n. 5 (E.D.Cal. June 9, 2000) ("At the preliminary injunction stage, . . . the court may consider hearsay"); *Michaels v. Internet Entertainment Group*, 5 F. Supp. 2d 823, 832, n. 2 (C.D. Cal. 1998) ("Although the parties have not formally objected to the hearsay basis of this statement, Michaels notes in his moving papers that numerous hearsay objections arise from Revilla's deposition. Although Revilla's assertions about the statements of his unnamed client would be subject to a hearsay objection at trial or at summary judgment, the Court may consider hearsay at the preliminary injunction stage"); *Mattel, Inc. v. MCA Records, Inc.*, No. CV 97-6791 WMB, 1998 WL 422641, * 1 (C.D. Cal. Feb. 18, 1998) (denying both parties' motions to strike declarations because "'strict evidentiary rules'" do not apply to preliminary injunction hearings (citations omitted)).

[2]Declaration of Terri Williamson in Support of Motion for Preliminary Injunction ("Williamson Decl.") ¶ 4, Ex. B.

[3]Williamson Decl., ¶ 5, Ex. B (page from Patent and Trademark website showing status of Glow, Inc.'s trademark application); Declaration of Arthur Aaronson in Support of Motion for Preliminary Injunction ("Aaronson Decl."), ¶ 4; Declaration of Lisa Pearson in Support of Defendant's Opposition to Motion for Preliminary Injunction ("Pearson Decl."), ¶ 3, Ex. 49 (file wrapper for Serial No. 75/693,513 of plaintiff's GLOW application).

of the positive feeling the word evokes."[4]  Glow, Inc.'s trademark application specifies that the mark is used in connection with the sale of skin soaps, bubble bath, skin lotions, skin moisturizers, and candles.[5]  Williamson states that her company's initial offerings, as reflected in the trademark application, were "lotions, oils, shower gels, candles and bath products."  She asserts, however, that a GLOW perfume was developed, tested, and sold at Glow, Inc.'s retail store in fiscal year 2000.  The perfume was launched on a national scale in 2001.[6]

### A.    Glow, Inc.'s Use Of The GLOW Mark

The GLOW line was sold at Glow, Inc.'s retail store in Los Angeles commencing in 1999.  It was offered through the national beauty website <www.gloss.com> beginning in the Spring of 2000.[7]  Following a launch at the Paramount Hotel in New York City attended by approximately forty members of the national press in April 2000, the line was offered at Bergdorf Goodman in New York City commencing in the Fall of 2000.[8]  GLOW products are currently sold at various retail establishments across the country, including: Nordstrom stores in many states; Ritz Carlton Hotels; Glow, Inc.'s own store in Los Angeles; and retail stores in California, Washington, Utah, Montana, New York, New Jersey, Pennsylvania, Illinois, Michigan, Ohio and Florida.  They are also offered on Glow, Inc.'s internet site <www.glowspot.com>.[9]  The products are physically present in stores in thirteen states, and have been sold in all fifty states through boutiques, department stores, the internet, and mail order.[10]  Glow, Inc. has also participated in co-branding ventures with prominent national companies such as Reebok and the

---

[4]Reply Declaration of Terry Williamson ("Williamson Reply Decl."), ¶ 4.

[5]Williamson Decl., Ex. B.

[6]Williamson Reply Decl., ¶ 9.

[7]*Id.*, ¶ 10.

[8]*Id.*, ¶¶ 8, 10.

[9]Williamson Decl., ¶ 6.

[10]Williamson Reply Decl., ¶ 11.

1  Ritz-Carleton.[11]

2  Williamson started Glow, Inc. using her own resources, and asserts that the company has

3  been engaged in grass-roots marketing since its inception.[12]  GLOW products have been featured

4  in magazines such as "InStyle" (featuring GLOW oversized all-natural bath cakes in February

5  2002; GLOW bath and body products, including body oil, shower gel, and lotion in May 2001;

6  and the GLOW "Male Pail" gift basket with bath and body products for men); "Los Angeles

7  Magazine" (featuring GLOW aromatic bath products, including lotion and lip balm in July 2000);

8  "Harper's Bazaar" (featuring GLOW aromatherapy oils in September 2002); "The Hollywood

9  Reporter" (featuring GLOW bath and body gift pails and boxes in November 2000);

10  "Mademoiselle" (featuring GLOW "naughty night pillow mist" in November 2000); "Marie

11  Claire" (featuring GLOW soaps in September 2000); "Seventeen" (featuring GLOW bath truffles

12  in September 2000); "Redbook" (featuring GLOW chamomile and lavender salt scrub and GLOW

13  tub truffles in September 2000); "Gourmet" (featuring GLOW mini-bundt cakes and bath truffles

14  in July 2000); "Lucky" (featuring the GLOW gardenia glowlight votive candle and GLOW bath

15  truffles in May 2002); "Entertainment Weekly" (featuring GLOW bath and body products in

16  September 2002, and mentioning this litigation); "W" (featuring GLOW mini-bundt cakes and bath

17  truffles in March 2001); and "Detour" (featuring GLOW bath and beauty products as newly

18  available at Bergdorf Goodman in New York).[13]

19  A November 2001 article in the "New York Times Magazine" mentions Glow, Inc.'s store

20  as "the place for all things lotiony, bathalicious and good smelling, where nothing is made with

21  chemicals," while a February 2002 edition features GLOW miniature bathtub bundt cakes.[14]  None

22

23

24

25  [11]*Id.*, ¶ 3.

26  [12]*Id.*, ¶¶ 3, 18.

27  [13]Williamson Decl., ¶ 9.

28  [14]*Id.*, ¶ 9, Ex. C.

4

1    of this press coverage was purchased advertising.[15]

2    Williamson states that a producer from the E! television network approached her in

3    September 2001, and sought permission to use the GLOW mark for a show regarding fashion and

4    beauty to be hosted by defendant Lopez's sister, Lynda Lopez. Williamson gave permission, and

5    GLOW products were featured on one episode of the show.[16]  Williamson was also contacted by

6    staff for the daytime drama, "The Young and the Restless," following cast members' positive

7    response to GLOW gift baskets they had received. The show asked that Williamson permit it to

8    call a fictionalized product line including makeup and perfume "Glow by Jabot." Williamson

9    "took this as an honor and compliment of GLOW products," and gave her consent.[17]  The storyline

10   began to air in August 2001.[18]

11   Entertainment companies frequently ask Glow, Inc. to provide gift baskets to cast and crew

12   members. Williamson asserts that a GLOW gift basket was delivered to defendant Jennifer Lopez

13   in March 2001.[19]  The invoice for the delivery indicates that the basket included sandalwood

14   lotion, a sandalwood candle, a "CVP GLOWstick," and a vanilla bath truffle.[20]

15   **B.    The GLOW BY J.LO Product Line And Its Impact**

16   Defendant Jennifer Lopez, also known as J.Lo, is an internationally known singer, dancer,

17   actress and fashion designer.[21]  Defendant Coty, Inc. is one of the world's leading manufacturers

18

---

19   [15]Williamson Reply Decl., ¶ 18.

20   [16]*Id.*, ¶ 25.

21

22   [17]*Id.*, ¶ 24; Declaration of Lisa Pearson in Support of Defendant's Opposition to Plaintiff's
     Motion for a Preliminary Injunction ("Pearson Decl."), ¶ 47, Ex. 88.

23   [18]Memorandum of Points and Authorities in Opposition to Motion for Preliminary
24   Injunction ("Def.'s Opp."), at 6:18-22.

25   [19]Williamson Decl., ¶ 10.

26   [20]*Id.*, Ex. D.

27   [21]Declaration of Catherine Walsh in Support of Defendants' Opposition to Plaintiff's
28   Motion for Preliminary Injunction ("Walsh Decl."), ¶ 4.

1    and marketers of women's and men's fragrances, cosmetics and skin care products.[22]   On

2    February 25, 2002, Lopez filed an application to register the trademark GLOW BY J.LO for

3    "fragrances, cosmetics, and skin care products."[23]   On March 15, 2002, Coty, through its

4    Lancaster Group division, entered into an exclusive worldwide licensing agreement with Lopez's

5    company, Sweetface Fashion Co., LLC.   The agreement contemplates the development and

6    marketing of fragrances and cosmetics under the J.Lo brand, using the Jennifer Lopez name.[24]

7    Although Lancaster Group issued a press release that day, announcing the agreement, the release

8    did not mention the GLOW BY J.LO mark.[25]

9         Catherine Walsh, Vice President of Marketing, Cosmetics and American Licenses for the

10   Lancaster Group, states that Coty and Lopez chose the mark GLOW BY J.LO "because Ms. Lopez

11   is known for her lovely glowing skin and her inner 'glow,'" and because "we also like the

12   rhyming element of the phrase."[26]   Coty announced the launch of the GLOW BY J.LO line in June

13   2002.[27]   The anchor product is an eau de toilette (diluted perfume) packaged in a stylized bottle.

14   The bottle is intended to represent the shape of "a slightly asymmetrical woman's body."   It is

15   draped with a necklace bearing the J.Lo design logo.   The GLOW BY J.LO line also includes a skin

16   lotion and a shower gel, both of which are packaged in conventional squeeze tubes featuring the

17   GLOW BY J.LO mark.   All three products are sold in white boxes featuring the GLOW BY J.LO

18   mark superimposed over replications of the J.Lo design logo.[28]   Each product has the same scent,

19

20

21        [22]*Id.*, ¶ 2.

22        [23]Reply Declaration of Arthur Aaronson ("Aaronson Reply Decl."), ¶¶ 8, 10, Ex. P (print out of Patent and Trademark Office's web page for "GLOW BY J.LO").

23

24        [24]Walsh Decl., ¶ 3.

25        [25]Aaronson Reply Decl., ¶ 10, Ex. R (press release).

26        [26]Walsh Decl., ¶¶ 1, 7.

27        [27]*Id.*, ¶ 7.

28        [28]*Id.*, ¶¶ 7, 9, Ex. 47.

i.e., a blend of orange flower, grapefruit, rose, sandalwood, soft amber, transparent jasmine, vanilla, musk and orris.[29]

GLOW BY J.LO was launched, with extensive media coverage, on June 27, 2002, at a private apartment in the Trump Tower in New York City. The event featured a grand finale in which fireworks over the Hudson River illuminated the GLOW BY J.LO mark.[30]  Defendants have since initiated an intensive U.S. consumer marketing campaign; their expenditures totaled $2.1 million by July 3, 2002, and are $5.2 million to date.[31]  The first GLOW BY J.LO products were shipped to stores on June 28, 2002.[32]  Plaintiff's attorney, Arthur Aaronson, states that he has personally seen numerous advertisements for GLOW BY J.LO products "in magazine[s], [on] billboards, television[,] . . . at shopping malls and on the internet."[33]  According to Glow, Inc.'s Williamson, a billboard advertising GLOW BY J.LO products is located approximately one mile from the GLOW retail store.[34]

Williamson first became aware of Lopez's intent to release a perfume, body lotion, and shower gel under the name GLOW BY J.LO in June 2002.[35]  She then began receiving inquiries from her retail and wholesale customers, who exhibited confusion regarding the relationship between defendants and Glow, Inc.  On June 21, 2002, Williamson received a fax from the "NFX Apothecary" in Florida, stating, in pertinent part:

> "Just a quick note with regard to something we saw in US Weekly – Are you now
>
> in 'cahoots' with "J-Lo"???  I am getting ready to order and was going to expand

---

[29]*Id.*, ¶ 7.

[30]*Id.*, ¶ 10.

[31]*Id.*, ¶¶ 12, 13.

[32]*Id.*, ¶ 13.

[33]Aaronson Decl., ¶ 14; Aaronson Reply Decl., Ex. N (sample advertisements).

[34]Williamson Reply Decl., ¶ 17.

[35]Williamson Decl., ¶ 11.

1   on your perfume – but – I had no idea you would tie-in with J-Lo – It doesn't seem

2   like your <u>image</u>???  I'm a bit confused?  So, I will review future order with you –

3   when I hear the scoop!"

4   Williamson received another fax from the same party on July 19, 2002, stating in pertinent part:

5   "FYI – I had some customers ask if your line was related to new J-Lo stuff they heard about."

6   Glow, Inc. also proffers notes written by employees in the GLOW retail shop on August 22 and

7   24, 2002, which state that shop customers asked if there was an affiliation between GLOW and

8   Lopez.[36]

9        Williamson has recently been attempting actively to negotiate sales arrangements with

10   department and high visibility stores around the country.[37]  She has also been involved in funding

11   negotiations with venture capital firms and other investors so that she can expand Glow, Inc.'s

12   presence in the marketplace.[38]  Williamson asserts that her investor group has put all plans for

13   expansion on hold until this action is resolved.[39]  She further states that, following the launch of

14   defendants' "GLOW BY J.LO" line "and the media blitz surrounding it," negotiations with major

15   department stores have been tabled, and several potential wholesale customers have advised her

16   "that they will not carry GLOW products until th[e] case is resolved."[40]

17        C.    **The Current Litigation**

18        On July 3, 2002, Glow, Inc. attorney Arthur Aaronson sent a letter to Lopez's trademark

19   attorney, Lawrence Apolzon, requesting that Lopez voluntarily cease using the name GLOW in

20   connection with her planned product line.[41]  Apolzon's partner, Lisa Pearson, sent Aaronson a

21

---

22   [36]*Id.*, ¶ 12, Ex. E.

23   [37]*Id.*, ¶ 7; Williamson Reply Decl., ¶ 14.

24

25   [38]Williamson Decl., ¶ 8.

26   [39]*Id.*, ¶ 8, Williamson Reply Decl., ¶ 3.

27   [40]Williamson Decl., ¶ 7; Williamson Reply Decl., ¶ 14.

28   [41]Aaronson Decl., ¶ 4; Aaronson Reply Decl., Ex. G.

letter on July 15, 2002, in which she acknowledged his correspondence and requested further information.[42]   Aaronson replied the same day; he provided a short overview of Glow, Inc.'s use of the GLOW mark, enclosed a press kit, and asked whether Lopez would voluntarily cease using the GLOW BY J.LO mark.[43]   On July 30, 2002, Aaronson sent a second letter requesting a response.[44]   On July 31, 2002, Pearson answered, asserting that GLOW has been commonly used in the beauty industry and that GLOW and GLOW BY J.LO are readily distinguishable given the "crowded field."[45]   The two attorneys conferred by telephone, but were unable to come to any resolution.[46]   Pearson contends she has told Aaronson on several occasions that her clients are open to discussing "commercially reasonable measures that could be taken to allay plaintiff's concerns."[47]   When this subject was raised during counsels' August 2002 telephone calls, Aaronson stated his impression that the GLOW BY J.LO line was going to be launched within a few days.   Pearson told him it would not be launched that soon.[48]

On August 7, 2002, Glow, Inc. filed suit against Coty and Lopez, alleging federal claims for trademark infringement, trademark infringement – reverse confusion, trademark dilution, false designation of origin, and Lanham Act unfair competition.   The complaint additionally pleaded state law claims for trademark infringement, reverse confusion, dilution, unfair competition, and an accounting.[49]   Once Aaronson ascertained that GLOW BY J.LO products were being advertised

---

[42]Aaronson Decl., ¶ 5; Aaronson Reply Decl., Ex. H.

[43]Aaronson Decl., ¶ 6; Aaronson Reply Decl., Ex. I.

[44]Aaronson Decl., ¶ 7; Aaronson Reply Decl., Ex. J.

[45]Aaronson Decl., ¶ 8; Aaronson Reply Decl., Ex. K.

[46]Aaronson Decl., ¶ 9; Pearson Decl., ¶ 48.

[47]Pearson Decl., ¶ 48.

[48]Aaronson Decl., ¶ 10; Aaronson Reply Decl., Ex. M (Sept. 13, 2002 letter from Lisa Pearson).

[49]Aaronson Decl., ¶ 11; Complaint.

1   and sold nationwide, he wrote Pearson on September 9, 2002, requesting verification that the

2   advertising and sales had been authorized by defendants.[50]   On September 13, 2002, Pearson

3   responded that defendants would not postpone the GLOW BY J.LO launch as a result of Glow,

4   Inc.'s lawsuit.[51] On September 24, 2002, Glow, Inc. filed a motion for a preliminary injunction,

5   requesting that the court enjoin defendants' use of the GLOW mark.

6        Defendants filed an answer and counterclaims for trademark infringement, Lanham Act

7   unfair competition, and California statutory unfair competition on October 8, 2002.   The

8   counterclaims are based on Lopez's acquisition by assignment on September 26, 2002, of all

9   rights to and interest in the registered trademark GLOW KIT.

10       Defendants proffer evidence that they have taken steps to reduce any likelihood of

11  confusion resulting from the similarity of the parties' marks and product lines.  Specifically, they

12  assert that advertising for GLOW BY J.LO has featured "photographs of Ms. Lopez next to the

13  GLOW BY J.LO eau de toilette bottle, in an effort to create a visual link between her physical

14  profile and the shape of the bottle."[52]   They also note that, "in a good faith effort to allay

15  plaintiff's expressed concerns, [they have] instituted guidelines for GLOW BY J.LO advertising to

16  exhibit the GLOW BY J.LO mark in a font of uniform size and color."[53]  Plaintiff counters that

17  defendants' current advertisements do not follow these guidelines, because (1) the typeface of

18  advertisements is the same as that which was used in advertisements running at the time the action

19  was filed, and (2) the image of Jennifer Lopez is absent from several print and television

20  advertisements for GLOW BY J.LO.[54]  Indeed, a GLOW BY J.LO television commercial proffered

21  as evidence by plaintiff focuses visually on the term GLOW, and repeats the word verbally multiple

22

23  _____

24   [50]Aaronson Decl., ¶ 12; Aaronson Reply Decl., Ex. L.

25   [51]Aaronson Decl., ¶ 13; Aaronson Reply Decl., Ex. M.

26   [52]Walsh Decl., ¶ 11.

27   [53]*Id.*, ¶ 14.

28   [54]Williamson Reply Decl., ¶¶ 15-16, Exs. S, T.

1  times before stating the full name of the product, GLOW BY J.LO.[55]

2  **D.  Glow, Inc.'s Pending Trademark Application**

3  Glow, Inc. attorney Aaronson submitted an application to register the GLOW trademark in

4  April 1999.[56] Defendants' attorney Lisa Pearson states:

5  "A review of the file wrapper for this application discloses that in an Office Action

6  mailed November 18, 1999. . . , the Examining Attorney refused registration

7  'because the applicant's mark when used on or in connection with the identified

8  goods, so resembles the marks in U.S. Registration Nos. 1,099,151 [the mark

9  ULTRA GLOW for 'skin moisturizing creme and stick'], 1,973,583 [the mark ULTRA

10  GLOW for 'cosmetic products, namely soaps, toilet soaps, bar soaps, liquid soaps,

11  liquid toilet soaps, essential oils, skin care preparations, creams, cosmetic facial

12  creams, skin tone creams, skin lotions, moisturizers, cocoa butter creams and

13  sticks, beauty bars, and facial scrubs'] and 2,288,023 [the mark GLOW KIT for

14  'cosmetics sold separately and as a kit, namely, alpha hydroxy acid skin creams,

15  facial cleansing lotions, and skin creams containing vitamin A derivatives']."[57]

16  Aaronson responded to this office action in January 2000, arguing that ULTRA GLOW was not

17  confusingly similar to GLOW because "ULTRA" was not disclaimed, and therefore constituted an

18  integral part of the registered mark.  He further noted that ULTRA GLOW was not registered for

19  use in connection with candles.[58] Aaronson also contends that he resolved the objection respecting

20  the GLOW KIT mark during a telephone conversation with the trademark examiner.  He maintains

21  that GLOW KIT is "distinguishable in look, sound, and spelling" from GLOW, and that it is "used

22  only locally by a physician for a medical alpha-hydroxy skin preparation [that] has nothing to do

23

24  _____

25  [55]Williamson Reply Decl., ¶ 16, Ex. T.

26  [56]Aaronson Decl., ¶ 4.

27  [57]Pearson Decl., ¶ 4, Ex. 49 (file wrapper for GLOW trademark application).

28  [58]*Id.*, ¶ 5, Ex. 49 at 23-24.

11

with fragrances."[59] Pearson counters that an examining attorney will typically "make[ ] a notation 'W/D' followed by his initials in the margin of the Office Action" if and when he withdraws a blocking citation. She points out that no such notation was made on the office action regarding the ULTRA GLOW and GLOW KIT marks.[60]

In his January 2000 letter to the Patent and Trademark Office, Aaronson amended the description of goods in the trademark application, substituting "skin soaps," for "soaps," and "skin moisturizers" for "moisturizers."[61] On April 6, 2000, the examiner accepted this proposed amendment, but suspended further action on the application pending action on Application Serial No. 75/515,208, which concerns the mark SUN GLOW for "skin care preparations, namely, lotions, moisturizers, creams, toners, exfoliators, astringents, cleansers, masks, soaps, lip balms, scrubs, sun screens, sun tanning gels, sun cream, sun lotions and conditioners."[62] Glow, Inc.'s application for publication was finally approved on August 18, 2002, after the PTO deemed the SUN GLOW mark abandoned.[63]

In September 2002, after this action had been filed, defendants' attorney submitted a letter of protest to the PTO on Jennifer Lopez's behalf. The letter identified several purported "irregularities in the processing" of the GLOW application, namely that: (1) the November 18, 1999, block placed on the application had apparently not been removed and (2) Glow, Inc.'s January 2000 response letter did not address the examiner's objection regarding the GLOW KIT mark.[64] On September 26, 2002, Leone A. Guilio, the owner of the GLOW KIT mark, Reg. No.

---

[59]Aaronson Reply Decl., ¶ 5.

[60]Pearson Decl., ¶ 7.

[61]*Id.*, ¶ 6, Ex. 49 at 23-24.

[62]*Id.*, Ex. 49 at 22 (letter suspending application); Aaronson Decl., ¶ 4. .

[63]Pearson Decl., ¶ 6, Ex. 49; Aaronson Decl., ¶ 4.

[64]Pearson Decl., ¶ 8, Ex. 50.

1    2,288,023, assigned all of his right, title and interest in the mark to Jennifer Lopez.[65]

2        The GLOW trademark was published for opposition in the Official Gazette on November

3    5, 2002.[66]  Defendants assert they will oppose the application, in order to reassert their earlier

4    protest regarding "irregularities in processing," and to make new arguments regarding possible

5    infringement of the GLOW KIT mark.  The latter issue is the subject of Lopez's counterclaims in

6    this action.[67]  It is the PTO's practice to suspend internal proceedings, including opposition

7    proceedings, during the pendency of trademark infringement litigation involving the competing

8    marks.[68]  For this reason, Pearson asserts that Glow, Inc.'s application will likely be suspended,

9    and that the GLOW mark will not be registered until there is a final adjudication of defendants'

10    counterclaims in this action.[69]

11      **E.**     **Other Products Using GLOW As A Trademark Or Trade Name**

12        There are many registered trademarks for beauty products that incorporate "glow" or

13    variants thereof.[70]  These include marks for several make-up and hair care products, i.e.,

14    (1) RADIANT GLO, issued in February 1984 for "liquid facial makeup and hair shampoo;"[71]

15    (2) FLAME GLOW, issued in January 1985 for "lip polish, blushers, blushing kit comprising blush

16    and blusher palettes, eyeliner, eye shadow, and eye shadow kits comprising applicator and eye

17

    ————————————

18        [65]Pearson Decl., ¶ 12, Ex. 53 (trademark assignment).

19        [66]Aaronson Decl., ¶ 4; Aaronson Reply Decl., ¶ 4, Ex. O (Patent and Trademark Office's
20    Notice of Publication).

21        [67]Pearson Decl., ¶ 9.

22        [68]*Id.*, ¶ 10, Ex. 51 (Trademark Appeal Board Manual of Procedure § 510.02(a)).

23        [69]*Id.*, ¶¶ 9-10.

24        [70]Defendants proffer a number of trademark applications that seek to register variations of
25    the term "glow," and a number of personal care products in the market that incorporate the term.
   (See Def.'s Opp at 5:27-6:22; Pearson Decl., ¶¶ 34-44, 47, Exs. 75-85, 88; Declaration of
26    Christina Susky in Support of Defendants' Opposition to Motion for Preliminary Injunction
27    ("Susky Decl."), ¶¶ 6-49, Exs. 3-46.)

28        [71]Pearson Decl., ¶ 14, Ex. 55 (Reg. No. 1,267,575).

shadow palettes," and in November 1985 for an even broader range of make-up products and make-up kits;[72] (3) BEAUTY GLOW, issued in March 1989 for "body and hair shampoo;"[73] (4) AMBER GLOW, issued in 1989 for "hair coloring preparation;"[74] (5) ALMA'S GLOW, issued in January 1990 for "hair shampoo; hot oil treatment for hair; hair conditioner; oil sheen for hair; hair growth and scalp aid; and hair dressing;"[75] (6) EARTH'S GLOW, issued in August 1991 for "cosmetics, namely facial and eye make-up and nail enamel;"[76] (7) NATURAL GLOW, issued in March 1992 for "lip gloss, lipstick, blusher, mascara, eye shadow, cosmetic pencils, namely, eye, lip and cheek pencils, and eye liner;"[77] (8) FRESH GLOW, issued in March 2000 with a first use in commerce of September 1998 for "cosmetics, namely foundation makeup;"[78] (9) FLAME-GLO, issued in March 1984 for "cosmetics pencils, namely eye shadow pencils, eyebrow pencils, lip pencils, eyeliner pencils, and cheek pencils; make-up kits consisting of eye shadows, blushers, face powder, lip color, lip gloss, lip liner, mascara and eyeliner; and rouge."[79]

Existing variants also include a number of skin care products such as lotions, oils, soaps, scrubs, and bath salts. These include: (1) ALMOND GLOW, issued in October 1984 for "skin care preparations – namely, lotion, moisturizers and massage oils;"[80] (2) ALPHA GLOW, issued in July 1995 for "cosmetic preparations; namely, skin care lotions, creams, and oils; toilet soaps; skin

---

[72]Id., ¶¶ 16-17, Exs. 57-58 (Reg Nos. 1,311,886 and 1,369,733).

[73]Id., ¶ 18, Ex. 59 (Reg. No. 1,529,250).

[74]Id., ¶ 19, Ex. 60 (Reg. No. 864,068).

[75]Id., ¶ 20, Ex. 61 (Reg. No. 1,579,720); Susky Decl., ¶ 9, Ex. 6 (picture of ALMA'S GLOW oil of seven-herb multi-purpose oil for complexion, body, skin and hair).

[76]Pearson Decl., ¶ 21, Ex. 62 (Reg. No. 1,654,141).

[77]Id., ¶ 22, Ex. 63 (Reg. No. 1,679,798).

[78]Id., ¶ 29, Ex. 70 (Reg. No. 2,336,712).

[79]Id., ¶ 33, Ex. 74 (Reg. No. 1,269,565).

[80]Id., ¶ 15, Ex. 56 (Reg. No. 1,300,093); Susky Decl., ¶ 11, Ex. 8 (picture of ALMOND GLOW jasmine skin lotion).

14

moisturizers, bath oils and gels. . . ;"[81] (3) ULTRA GLOW, issued in May 1996 for "cosmetic products, namely soaps, toilet soaps, bar soaps, liquid soaps, liquid toilet soaps, essential oils, skin care preparations, creams, cosmetic facial creams, skin tone creams, skin lotions, moisturizers, cocoa butter creams and sticks, beauty bars, and facial scrubs;"[82] (4) AGLOW, issued in March 1997 for "perfume and cologne, body and hand lotion, bath gel, body powder, skin cleanser, soaps. . . ;"[83] (5) AMBER GLOW, issued in June 1998 with a first use in commerce of May 1997 for ". . . cosmetic and skin care products, namely skin lotion containing cocoa butter, skin moisturizers, skin conditioning lotions, and skin toning preparations;"[84] (6) ULTRA GLOW, issued in March 2000 with a first use in commerce of May 1976 for "personal care products, namely, skin soaps, toilet soaps, bar soaps, liquid soaps, liquid toilet soaps, essential oils for personal use, skin care preparations, namely, wrinkle removing skin care preparations, sun tan lotion, skin texturizers, skin emollients, bath oils, bath gels, hand creams, cosmetic facial creams, skin tone creams, skin lotions, skin moisturizers, cocoa butter skin creams and sticks, beauty bars for cleansing and conditioning skin, facial scrubs and hair care preparations;"[85] and (7) GLO POWER, issued in November 2000 with a first use in commerce of May 1998 for "toiletry products comprising cleaning, exfoliating, moisturizing preparations and perfumes, namely body wash and body lotions, bath and shower gels, foams, bubbles, oils, and non-medicated bath salts, bath bombs, hand and body soaps, skin lotions comprising massage oils, spray lotions for body, foot lotion, exfoliating body scrub, combination skin moisturizers and skin cleaners, water-less

---

[81]Pearson Decl., ¶ 23, Ex. 64 (Reg. No. 1,904,873).

[82]*Id.*, ¶ 24, Ex. 65 (Reg. No. 1,973,583); Susky Decl., ¶ 7, Ex. 4 (picture of ULTRA GLOW skin tone cream).

[83]Pearson Decl., ¶ 26, Ex. 67 (Reg. No. 2,047,774).

[84]*Id.*, ¶ 27, Ex. 68 (Reg. No. 2,162,610).

[85]*Id.*, ¶ 28, Ex. 69 (Reg. No. 2,334,699).

1    antibacterial soaps, perfume splash, liquid talc, spray liquid powder."[86]

2        There are also several registered marks using "glow" or a variant thereof in connection

3    with candles and fragrances, including: (1) THE AFTER GLOW, issued in August 1996 for "scented

4    fragrances or perfumes which may be sprayed on beds, bedroom furniture, pajamas, towels and

5    bedclothes;"[87] (2) AGLOW, previously discussed; (3) GLOWING ART, issued in November 2000

6    with a first use in commerce of June 1996 for "candles, scented candles and gel candles;"[88] and

7    (4) DISCO GLOW, issued in November 2000 with a first use in commerce of October 1999 for

8    "cosmetics, namely lipstick, nail polish, and fragrances, namely perfume and cologne."[89]

9

10                           **II.  DISCUSSION**

11   **A.    Standard Governing Injunctive Relief**

12       In deciding whether to issue a preliminary injunction, the court must consider: (1) the

13   likelihood of the moving party's success on the merits; (2) the possibility of irreparable injury to

14   the moving party if relief is not granted; (3) the extent to which the balance of hardships tips in

15   favor of one party or the other; and in certain cases (4) whether the public interest will be

16   advanced by granting preliminary relief. *Miller v. California Pacific Med. Ctr.*, 19 F.3d 449, 456

17   (9th Cir. 1994). See also *Mayweathers v. Newland*, 258 F.3d 930, 938 (9th Cir. 2001) (". . . the

18   traditional equitable criteria for granting a preliminary injunction . . . are '(1) a strong likelihood

19   of success on the merits; (2) the possibility of irreparable injury to the plaintiffs if injunctive relief

20   is not granted; (3) a balance of hardships favoring the plaintiffs; and (4) advancement of the

21   public interest'"). The court may issue a preliminary injunction if the moving party establishes

22   either (1) a combination of probable success on the merits and the possibility of irreparable harm,

23

24   _____

25       [86]*Id.*, ¶ 30, Ex. 71 (Reg. No. 2,403,365).

26       [87]*Id.*, ¶ 25, Ex. 66 (Reg. No. 1,997,207).

27       [88]*Id.*, ¶ 31, Ex. 72 (Reg. No. 2,404,139).

28       [89]*Id.*, ¶ 32, Ex. 73 (Reg. No. 2,406,426).

1  or (2) the existence of serious questions going to the merits, a demonstration that there is at least

2  a fair chance the movant will prevail, and a balance of hardships that tips sharply in the movant's

3  favor. *Textile Unlimited, Inc. v. A.BMH & Co., Inc.*, 240 F.3d 781, 786 (9th Cir.2001); *Miller,*

4  *supra*, 19 F.3d at 456. "These two formulations represent two points on a sliding scale in which

5  the required degree of irreparable harm increases as the probability of success decreases." *Miller,*

6  *supra*, 19 F.3d at 456. See also *Tillamook County v. U.S. Army Corps of Engineers*, 288 F.3d

7  1140, 1143 (9th Cir. 2002) ("To obtain preliminary injunctive relief, the movant must show: (1) a

8  probability of success on the merits combined with a possibility of irreparable harm if the relief

9  is denied; or (2) serious questions are raised and the balance of hardships tips sharply in the

10  movant's favor. These are not alternative tests but, instead, are extremes of a single continuum").

11      **B.**    **Glow, Inc.'s Likelihood Of Success On The Merits Of Its Trademark**

12          **Infringement And Unfair Competition Claims**

13        Glow, Inc. pleads claims for trademark infringement, trademark dilution, and Lanham Act

14  unfair competition, as well as state statutory and common law claims. Because the parties'

15  briefing focuses exclusively on Lanham Act trademark infringement and unfair competition, the

16  court has confined its analysis to these claims.[90]

17  --------

18     [90]Glow Inc. bases its request for a preliminary injunction on "its claim under Section
43(a)(1) of the Lanham Act." (Memorandum of Points and Authorities in Support of Motion for

19  a Preliminary Injunction ("Pl.'s Mot.") at 6.) Both Glow, Inc. and defendants address trademark

20  infringement rather than trademark dilution in their briefs. The standard for Lanham Act unfair
competition is the same as that for Lanham Act trademark infringement. See *Brookfield*

21  *Communications, Inc. v. West Coast Entertainment Corp.*, 174 F.3d 1036, 1045 (9th Cir. 1999)

22  ("To establish a trademark infringement claim under section 32 of the Lanham Act or an unfair
competition claim under section 43(a) of the Lanham Act, Brookfield must establish that West

23  Coast is using a mark confusingly similar to a valid, protectable trademark of Brookfield's");
*Kendall-Jackson Winery, Ltd. v. E. & J. Gallo Winery*, 150 F.3d 1042, 1046 (9th Cir. 1998)

24  ("Section 43(a) now protects both trademarks and trade dress from infringement"). Additionally,

25  the elements of state claims for trademark infringement and unfair competition are substantially
similar to those of the comparable federal claims. See *Entrepreneur Media, Inc. v. Smith*, 279

26  F.3d 1135, 1153 (9th Cir. 2002) (". . . 'actions pursuant to . . . § 17200 are "substantially

27  congruent" to claims made under the Lanham Act,'" quoting *Cleary v. News Corp.*, 30 F.3d
1255, 1263 (9th Cir. 1994); *U.S.A., Inc. v. Toys "R" Us, Inc.*, 84 F.3d 1143, 1152 (9th Cir.

28  1996) (". . . since dismissal of Denbicare's Lanham Act claim was proper, dismissal of its §

1    The purpose of trademark is to aid the "[i]dentification of the manufacturer or sponsor of

2 a good or the provider of a service." *New Kids on the Block v. News America Publishing, Inc.*,

3 971 F.2d 302, 305 (9th Cir. 1992). Trademarks represent "a limited property right in a particular

4 word, phrase, or symbol." *Id.* at 306. To find that defendants have infringed Glow, Inc.'s mark

5 the court will have to find that Glow, Inc. has a valid protectable trademark and that defendants'

6 use of the same or a similar mark causes a likelihood of confusion in the minds of the relevant

7 consuming public. See 15 U.S.C. § 1114(1)(a); *Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*,

8 826 F.2d 837, 841 (9th Cir. 1987); *First Brands Corp. v. Fred Meyer, Inc.*, 809 F.2d 1378, 1381

9 (9th Cir. 1987).

10    Glow, Inc. argues that defendants' infringement in this case takes the form of "reverse

11 confusion," i.e., that defendants have "so saturate[d] the market with promotion of [their]

12 trademark that consumers come to believe that the infringer, rather than the plaintiff, is the source

13 of the trademarked product." *Murray v. Cable National Broadcasting Co.*, 86 F.3d 858, 861 (9th

14 Cir.1996). See also *Dreamwerks Production Group, Inc. v. SKG Studio, d/b/a Dreamworks

15 SKG*, 142 F.3d 1127, 1130 (9th Cir.1998) ("The question in such cases is whether consumers

16 doing business with the senior user might mistakenly believe that they are dealing with the junior

17 user. More specifically, the question here is whether a reasonable consumer attending a

18 Dreamwerks-sponsored convention might do so believing it is a convention sponsored by

19 DreamWorks").

20         **1.    Protectability**

21              **(i)    Presumption Of Ownership And Right To Use**

22    Under 15 U.S.C. § 1115(a), a valid federal trademark registration constitutes *prima facie*

23 evidence that the holder owns the mark, and has the exclusive right to use the mark in commerce

24 in connection with the goods or services specified in the registration. See *Brookfield

25 Communications, supra,* 174 F.3d at 1046-47 (in determining likelihood of success on a motion

26 for preliminary injunction, the court "first determine[d] whether Brookfield ha[d] a valid,

27 _____

28 17200 claim was proper as well").

1  protectable trademark interest in the 'MovieBuff' mark," and held that "Brookfield's registration

2  of the mark on the Principal Register in the Patent and Trademark Office constitute[d] *prima facie*

3  evidence of the validity of the registered mark and of Brookfield's exclusive right to use the mark

4  on the goods and services specified in the registration"). See also *Maktab Tarighe Oveyssi Shah*

5  *Maghsoudi, Inc. v. Kianfar*, 179 F.3d 1244, 1249 (9th Cir. 1999) ("This registration constitutes

6  *prima facie* evidence that Angha owns the marks. . . . It also provides constructive notice of the

7  claimed ownership of the marks").

8      While Glow, Inc. asserts that registration of its mark is imminent, it does not presently

9  own a federal trademark registration, and registration is not guaranteed.  Thus, it may not avail

10  itself of the statutory presumption that it owns and has the right to use the GLOW mark in

11  commerce in connection with specified categories of goods.  See *Dalton Enterprises, Inc. v.*

12  *Copeland Coating Co., Inc.*, No. 90-CV-320, 1991 WL 117698, * 14 (N.D.N.Y. June 18, 1991)

13  ("a mark for which a notice of allowance is issued does not become a registered trademark until

14  this process is completed.  This includes a final examination by the PTO of the validity of the

15  mark.  There is no evidence in the record that this has been done for LATEX PLUS, and certainly

16  no certificate of registration has been issued.   Accordingly, LATEX PLUS is not entitled to the

17  presumption of validity a registered trademark carries").[91]

18                    (ii)    **Common Law Trademark Rights**

19      In the absence of presumed ownership, Glow, Inc. must establish that it has protectable

20  rights in the GLOW mark.   Potential trademarks fall into four categories: (1) generic,

21  (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful.  *Japan Telecom, Inc. v. Japan*

22  *Telecom Am. Inc.*, 287 F.3d 866, 872 (9th Cir. 2002); *Filipino Yellow Pages, Inc. v. AsianThe*

23

---

24      [91]The presumption of validity extends only to "the goods or services specified in the

25  registration."  See 15 U.S.C. § 1115(a); *Levi Strauss & Co. v. Blue Bell, Inc.*, 778 F.2d 1352,
    1354 (9th Cir. 1985) (en banc ).  Glow, Inc.'s trademark application seeks to register the GLOW

26  mark in connection with "skin soaps, bubble bath, skin lotions, skin moisturizers, and candles."
    (See Williamson Decl., Ex. B.)  Even had its application been approved and its mark registered,

27  therefore, Glow, Inc. would not be able to invoke the presumption of trademark validity as

28  respects use of the mark in connection with perfume or fragrance products.

                                                    19

1  *Journal Publs., Inc.*, 198 F.3d 1143, 1146 (9th Cir. 1999).  To establish a protectable trademark,

2  Glow, Inc. must prove either (1) that its mark is inherently distinctive or (2) that the mark has

3  acquired secondary meaning associated with Glow, Inc.'s business.  See *Disc Golf Association,*

4  *Inc. v. Champion Discs, Inc.*, 158 F.3d 1002, 1005 (9th Cir. 1998) ("To recover for the

5  infringement of a trademark . . . under section 43(a) of the Lanham Act, [plaintiff] had to prove

6  [*inter alia*] that . . . the [mark] is inherently distinctive or acquired distinctiveness through a

7  secondary meaning"); *Kendall-Jackson*, *supra*, 150 F.3d at 1047 ("[a]n identifying mark is

8  distinctive and is capable of being protected if it either (1) is inherently distinctive or (2) has

9  acquired distinctiveness through secondary meaning" (quoting *Two Pesos*, *supra*, 505 U.S. at

10  769)).

11       Generic terms cannot be protected as trademarks because "they are common words or

12  phrases that 'describe a class of goods rather than an individual product,'" and thus do not relate

13  exclusively to the trademark owner's product. *Japan Telecom*, *supra*, 287 F.3d at 872 (citing

14  *New Kids on the Block*, *supra*, 971 F.2d at 306).  Descriptive terms "suffer from the same

15  problem." *Id.*  Descriptive terms relate more directly to a particular product than do generic

16  terms, as they "describe[ ] a person, a place or an attribute of [the] product."  They will not

17  support the grant of an exclusive property right, however, "[b]ecause they tend to consist of

18  common words that might be the only way to describe a category of goods." *Id*. See also

19  *Kendall-Jackson Winery*, *supra*, 150 F.3d at 1047, n. 8 ("Descriptive marks define qualities or

20  characteristics of a product in a straightforward way that requires no exercise of the imagination

21  to be understood").

22       Terms that are suggestive, or arbitrary and fanciful, by contrast, are inherently distinctive,

23  and protectable as trademarks. *Japan Telecom*, *supra*, 287 F.3d at 872 (noting that such terms

24  are protectable "without a showing of secondary meaning").  A suggestive mark "conveys an

25  impression of a good but requires the exercise of some imagination and perception to reach a

26  conclusion as to the product's nature." *Brookfield Communications*, *supra*, 174 F.3d at 1058, n.

27  19 (using "Roach Motel" insect traps as an example). See also *Kendall-Jackson Winery*, *supra*,

28  150 F.3d at 1047, n. 8 (a suggestive mark is one for which "a consumer must use imagination or

1   any type of multistage reasoning to understand the mark's significance, [because] the mark does

2   not *describe* the product's features, but *suggests* them" (emphasis original)).   Arbitrary and

3   fanciful marks "have no intrinsic connection to the product with which the mark is used;

4   [arbitrary marks] consist[ ] of words commonly used in the English language [e.g. 'Black &

5   White' scotch whiskey], whereas [fanciful marks] are wholly made-up terms [e.g. 'Clorox'

6   bleach]." *Brookfield Communications, supra*, 174 F.3d at 1058, n. 19 (citations omitted).

7       Defendants argue that GLOW is generic, or at best descriptive.   Glow, Inc. argues it is

8   suggestive.   To determine which of these positions is correct, the court must examine "the

9   imaginativeness involved in the suggestion, that is, how immediate and direct is the thought

10  process from the mark to the particular product.   If the mental leap between the word and the

11  product's attribute is not almost instantaneous, this strongly indicates suggestiveness, not direct

12  descriptiveness." *Japan Telecom, supra*, 287 F.3d at 873 (citing *Self-Realization Fellowship*

13  *Church v. Ananda Church of Self-Realization*, 59 F.3d 902, 911 (9th Cir.1995)).

14      Defendants contend that GLOW is an adjective "commonly used to describe the nature,

15  shade, flavor, color or variety of various beauty products and the benefit to be achieved by their

16  use."[92]   Williamson counters that the GLOW mark was chosen primarily because of "the positive

17  feeling the word evokes."[93]   The mark is used differently in packaging and advertising Glow,

18  Inc.'s fragrance, shower gel, and body lotion products.   Accordingly, the court will consider the

19  distinctiveness of the mark with respect to each product individually.   See *Abercrombie & Fitch*

20  *Co. v. Hunting World, Inc.*, 537 F.2d 4, 11-12 (2d Cir. 1976) (invalidating Abercrombie &

21  Fitch's SAFARI trademark on clothing and hats, but not on boots or shoes, the court noted that

22  "[t]he word 'Safari' has become part of a family of generic terms which . . . have come to be

23  understood . . . as terms within the language referring to contemporary American fashion apparel.

24  These terms name the components of the safari outfit well known to the clothing industry and its

25  customers: the 'Safari hat,' . . . the 'Safari jacket,' . . . [and] the 'Safari suit.' . . .   A&F stands

26  _____

27      [92]Def.'s Opp. at 9:12-16.

28      [93]Williamson Reply Decl., ¶ 4.

1   on stronger ground with respect to HW's use of 'Camel Safari,' 'Hippo Safari' and Chukka

2   'Safari' as names for boots imported from Africa.  As already indicated, there is no evidence that

3   'Safari' has become a generic term for boots").  See also *Paddington Corp. v. Attiki Importers*

4   *& Distributors*, 996 F.2d 577, 583 (2d Cir. 1993) ("In classifying a trademark according to the

5   *Abercrombie* test, a court examines the context in which the words constituting the mark are used.

6   As one commentator explained, 'the word 'apple' would be arbitrary when used on personal

7   computers, suggestive when used in 'Apple-A-Day' on vitamin tablets, descriptive when used in

8   'Tomapple' for combination tomato-apple juice and generic when used on apples"); *Dowbrands,*

9   *L.P. v. Helene Curtis, Inc.*, 863 F. Supp. 963, 968 (D. Minn. 1994) ("A term that is in one

10  category for a particular product may be in a different category for another; thus 'Ivory' may be

11  a fanciful term when referring to soap but be generic or descriptive when referring to another

12  product").

13              (a)    **GLOW Perfume**

14          With respect to Glow, Inc.'s perfume, the GLOW mark clearly appears to be suggestive

15  rather than descriptive because "a consumer must use more than a small amount of imagination

16  to make the association." *Rodeo Collection, Ltd. v. West Seventh*, 812 F.2d 1215, 1218 (9th Cir.

17  1987).  The mark does not directly describe the attributes of Glow, Inc.'s perfume.  Indeed,

18  words other than the GLOW mark are used on the packaging to convey the fact that the perfume

19  is a sandalwood scent.[94]  The mark thus appears to refer suggestively to the positive feeling one

20  will achieve by using the product. See *Giorgio Beverly Hills, Inc. v. Revlon Consumer Products*

21  *Corp.*, 869 F. Supp. 176, 180 (S.D.N.Y. 1994) ("The mark 'RED' invites the consumer to

22  employ a bit of perception, thought, and imagination, to reach the conclusion that Giorgio's

23  fragrance is romantic, passionate, and sexy, and/or that the consumer will elicit the corresponding

24  emotions from others when wearing the fragrance"); *Elizabeth Taylor Cosmetics Co. v. Annick*

25  *Goutal, S.A.R.L.*, 673 F. Supp. 1238, 1243-44 (S.D.N.Y. 1987) ("Although the word 'passion'

26  may be used frequently in fragrance advertising copy, it is not a descriptive term.  Instead of

27  _____

28          [94]Walsh Decl., Ex. 48.

                                    22

1 describing the product, it describes an emotion the fragrance seeks to induce. Connecting the

2 emotion to the fragrance requires 'an effort of the imagination'"); *Patou, Inc. v. Jacqueline*

3 *Cochran, Inc.*, 201 F. Supp. 861, 864 (S.D.N.Y. 1962) ("There are two extremes in the choice

4 of a mark. A product may have a fanciful name, or at the other extreme, a name which is

5 primarily descriptive. In between there exists a large middle ground of names, which while

6 providing some description of the product, nevertheless demand an effort of the imagination to

7 be understood as descriptive. These names must be taken in a suggestive or figurative sense.

8 JOY[, as used for perfume,] stands in this middle ground"). See also *Charles of the Ritz Group,*

9 *Ltd. v. Marcon, Ltd.*, 635 F. Supp. 158, 161 (S.D.N.Y. 1986) (noting that "[t]he word 'silk' has

10 been widely adopted and used in the cosmetics industry," and that it "conjures up the image of

11 something that is soft and smooth and lustrous. It is frequently used in connection with cosmetics

12 or toiletries to suggest that the relevant product has the qualities of silk. The word, for example,

13 may suggest that eyeshadow will look as soft as silk, or lipstick will shine like silk. The word

14 is also used to suggest the desirable result the product will achieve for the consumer, i.e., that use

15 of the product will cause the consumer to have soft hair or smooth skin, or shiny fingernails").

16 (b)   GLOW Shower Gel And Body Lotion

17   The manner in which the GLOW mark is used on Glow, Inc.'s shower gel and body lotion

18 is arguably more descriptive, in that it conveys that use of the products will create glowing skin.

19 The products are called, respectively, "Wash and GLOW" "Body GLOW."[95]   In addition to a

20

---

21   [95]"Wash and GLOW" and "Body GLOW"are not marks Glow, Inc. seeks to protect through

22 this litigation. Rather, it attempts asserts only that defendants have infringed the GLOW mark that
is featured independently at the top of each product label. When a court must assess the validity

23 of a housemark in combination with a product mark, the protectability of each must be assessed
separately. See *Texicon, Inc. v. Cardinal Eng'g Corp.*, 164 U.S.P.Q. 397, 399, 1969 WL 8396

24 (T.T.A.B.1969) (holding that the product name ZIP was a protectable trademark "whether alone

25 or in association with" plaintiff's separate housemark, the court observed that ". . . there is no
statutory limitation on the number of trademarks that one may use on or in connection with a

26 particular product to indicate origin thereof in commerce. . . . Thus, it has been frequently held

27 that the mere use of a house or primary mark for one's goods does not preclude the adoption and
use of a product mark in connection therewith. . . . [J]udicial notice may be taken of the fact that

28 it is a common practice for manufacturers to apply both a house mark and a product mark to their

23

product name that incorporates GLOW, the label for each product features the GLOW mark displayed in a format that is identical to that found on the perfume label.  Glow, Inc.'s product catalog indicates that the body lotion "softens your skin and adds a healthy glow."[96]

While the product names "Wash and GLOW" and "Body GLOW" tend to describe the shower gel and body lotion, the court concludes that Glow, Inc. will ultimately be able to demonstrate that its primary mark GLOW is not wholly descriptive as used in connection with these products, since at least a small amount of imagination is required to connect the mark to the products it represents.  "Glow" is not descriptive of the qualities or characteristics of shower gels or body lotions.  Indeed, one who hears the word does not immediately think of such products.  Rather, some amount of association is required to link the concept of glowing skin to use of a particular gel or lotion.  See *Rodeo Collection, supra*, 812 F.2d at 1219 ("A person would not be likely to picture a shopping center upon first hearing the name 'Rodeo Collection.'  One must use some imagination to associate the word 'collection' with the collection of shops and restaurants that make up the shopping center.  The remoteness of that association indicates that a competing shopping center would not need to use the term 'collection' in order to identify its own shopping center").  Compare *Hanig & Co., Inc. v. Fisher & Co., Inc.*, No. 92 C 1779, 1994 WL 97758, * 3 (N.D. Ill. Mar. 24, 1994) ("[W]hen a manufacturer puts a descriptive term such as 'Bright-Glow' on its light bulbs the customer is uncertain whether these words are being used as a designation of origin or merely a description – a claim that the bulbs glow brightly.  Thus

---

various items of merchandise.  However, whether or not a particular designation used on a product along with a housemark possesses a separate trademark significance depends on the manner in which it is used and the commercial impression engendered as a result of such use").

[96]Williamson Decl., Ex. A ("GLOW to-Go" product catalog for summer 2002).  Glow, Inc. has used the mark in the same descriptive fashion in the names of other GLOW products, including: (1) "Shave and GLOW" shave lotion; (2) "GLOWstick" lip balm; (3) "GLOWlight" scented candles; and (4) the "Get-Well-and-GLOW" gift box.  Glow, Inc. has also incorporated the mark into product names that are less clearly descriptive, i.e., (1)"GLOW cakes," which are "bath fizzies" shaped like miniature bundt cakes; (2) "GLOW therapy soaps;" (3) "GLOW spa bath treatments;" (4) "GLOW spa facial masks;" (5) "GLOW eye pillows;" and (6) "GLOW ducks," which are rubber duckies for the bath.

1   it is not presumed that the public recognizes and associates a descriptive mark with a plaintiff's

2   products or services") with *Standard International Corp. v. American Sponge and Chamois Co.,*

3   *Inc.*, 394 F.2d 599, 600 (C.C.P.A. 1968) (concluding the "Glow," as used in DUST 'N GLOW,

4   was "suggestive of the effect of using a wax polish upon furniture"); *Sears Robuck & Co. v.*

5   *Haymer*, 263 F.2d 348, 349 (C.C.P.A. 1959) (noting, with respect to competing marks GLO-RAY

6   and GLOW for hairdressing products that, "while the hyphenation of appellee's mark sets 'GLO'

7   apart and probably gives a suggestion of glowing, . . . the primary impression created by the

8   mark as a whole is that of glory, or a shining ray.  Moreover, the word 'GLOW' as associated with

9   preparations designed to be applied to the hair does not appear to be arbitrary, but rather *suggests*

10  that a desirable result will be obtained when used" (emphasis added)).  See also *Jean Patou,*

11  *supra*, 201 F. Supp. at 10 ("The defendant's use of the word 'joy' in JOY OF BATHING . . . is used

12  to evoke a certain emotion on the part of the prospective purchaser.  The use of the phrase JOY

13  OF BATHING is designed to suggest the pleasure which will accompany the use of defendant's

14  product in one's bath").

15        For purposes of the present motion, therefore, the court finds that Glow, Inc. will likely

16  be able to prove that GLOW is a suggestive mark when used in connection with its perfume,

17  shower gel, and body lotion products, and that it will likely not be required to prove that the mark

18  has acquired secondary meaning in order to secure protection under the Lanham Act.

19              **(iii)    Whether Glow, Inc. Is The Senior User Of The GLOW Mark**

20        Because neither party presently holds a registration for GLOW, neither can take advantage

21  of the presumption of protectability provided by trademark registration.  Glow, Inc. thus must

22  establish that it is the senior user of GLOW in connection with perfume, shower gel, and body

23  lotion before it can prevail in its infringement action.

24        Priority for purposes of trademark law is established by commercial usage.  See *Sengoku*

25  *Works Ltd. v. RMC Int'l, Ltd.*, 96 F.3d 1217, 1219 (9th Cir. 1996) ("It is axiomatic in trademark

26  law that the standard test of ownership is priority of use.  To acquire ownership of a trademark

27  it is not enough to have invented the mark first or even to have registered it first; the party

28  claiming ownership must have been the first to actually use the mark in the sale of goods or

1    services"). "The first to use a mark is deemed the 'senior' user and has the right to enjoin

2    "junior" users from using confusingly similar marks in the same industry and market or within

3    the senior user's natural zone of expansion." *Brookfield Communications, supra,* 174 F.3d at

4    1046. See also *Union Nat'l Bank of Tex., Laredo, Tex. v. Union Nat'l Bank of Tex., Austin,*

5    *Tex.,* 909 F.2d 839, 842-43 (5th Cir. 1990); *Tally-Ho, Inc. v. Coast Community College District,*

6    889 F.2d 1018, 1023 (11th Cir. 1989); *New West Corp. v. NYM Co. of Cal.,* 595 F.2d 1194,

7    1200-01 (9th Cir. 1979).

8           Use of the mark must be "sufficiently public" that the marked goods are "identif[ied] or

9    distinguish[ed] . . . in an appropriate segment of the public mind as those of [the adopter of the

10   mark].'" *Johnny Blastoff, Inc. v. Los Angeles Rams Football Co.,* 188 F.3d 427, 433-34 (7th Cir.

11   1999) (quoting *New West Corp. v. NYM Co. of Cal., Inc.,* 595 F.2d 1194, 1200 (9th Cir. 1979)).

12   To established that the public identifies the mark with a particular product source, the fact-finder

13   may rely on its use in "'advertising brochures, catalogs, newspaper ads, and articles in

14   newspapers and trade publications,' as well as in media outlets such as television and radio." *Id.*

15   at 434 (citations omitted). See also *Communications Satellite Corp. v. Comcet, Inc.,* 429 F.2d

16   1245 1248-49 (4th Cir. 1970) (holding that plaintiff's promotion and use of the distinctive mark

17   "Comsat" as an abbreviation for its company, together with frequent references to the company

18   by the Comsat name in magazines and newspapers, was sufficient to support a finding that the

19   name was a strong and protectable mark).

20          The evidence shows that Glow, Inc. began selling its perfume, shower gel, and body lotion

21   under the GLOW mark prior to the time Coty and Lopez began to sell GLOW BY J.LO products.

22   Glow, Inc. founder Williamson states that the company first used the mark in commerce on

23   February 28, 1999. Its federal trademark application was filed on April 29, 1999, and sought

24   registration of the mark, *inter alia,* in connection with the sale of skin soaps, lotions, and

25   moisturizers.[97] While the record contains no specific evidence as to when Glow, Inc.'s shower

26   gel and body lotion were first sold, the lotion was featured in Los Angeles Magazine in July 2000,

27

28          [97]*Id.,* ¶¶ 4-5, Ex. B.

1  and the lotion and shower gel were showcased in InStyle magazine in May 2001.[98]  Williamson

2  states that GLOW perfume was sold under the mark at the company's retail store in 2000, and

3  launched on a national scale in 2001.[99]  The launch of the GLOW BY J.LO product line, by

4  contrast, did not occur until June 2002.[100]  The court thus concludes that, considered in isolation,

5  Glow, Inc. will likely be able to demonstrate that it commenced its commercial use of the GLOW

6  mark before defendants entered the market with their GLOW BY J.LO mark.

7      Defendants argue, however, that Lopez's recent acquisition of the GLOW KIT mark makes

8  her the senior user.  GLOW KIT mark is a registered federal trademark, published on July 7, 1999,

9  for use in connection with "[c]osmetics sold separately and as a kit, namely, alpha hydroxy acid

10  creams, facial cleansing lotions, and skin creams containing vitamin A derivatives."[101]  The GLOW

11  KIT mark is not registered for use in connection with shower gels or fragrances, and thus could

12  not affect priority of use as respects those products.

13      Based on the limited record before it, the court concludes that defendants may well be able

14  to establish that the GLOW KIT mark was validly assigned to Lopez.  The assignment recites that

15  both the mark and the goodwill associated with it are being transferred to Lopez.[102]  See 15

16  U.S.C. § 1060 ("A registered mark or a mark for which an application to register has been filed

17  shall be assignable *with the good will of the business in which the mark is used*, or with that part

18  of the good will of the business connected with the use of and symbolized by the mark" (emphasis

19  added)); *Sugar Busters LLC v. Brennan*, 177 F.3d 258, 265 (5th Cir. 1999) ("a trademark cannot

20  be sold or assigned apart from the goodwill it symbolizes"); *E. & J. Gallo Winery v. Gallo Cattle

21  Co.*, 967 F.2d 1280, 1289 (9th Cir. 1992) ("the goodwill of the business . . . must accompany

---

[98]*Id.*, ¶ 9.

[99]Williamson Reply Decl., ¶ 9.

[100]Walsh Decl., ¶ 7.

[101]Pearson Decl., Ex. 52.

[102]*Id.*, Ex. 53.

the mark"). While the assignor will continue to use the mark as the result of a licensing arrangement,[103] the Ninth Circuit has held that such "assignment and license-back" agreements can be valid transfers of a mark and the goodwill associated with it. See *E. & J. Gallo, supra*, 967 F.2d at 1290 ("[A] simultaneous assignment and license-back of a mark is valid, where, as in this case, it does not disrupt continuity of the products or services associated with a given mark").

The fact that the assignment appears to have been motivated primarily by defendants' desire to secure priority over Glow, Inc. does not detract from the validity of the assignment. See *Carnival Brand Seafood Co. v. Carnival Brands, Inc.*, 187 F.3d 1307, 1309 (11th Cir. 1999) (holding that an assignment to achieve priority over a rival was valid); *Money Store v. Harriscorp Finance, Inc.*, 689 F.2d 666, 677 (7th Cir. 1982) ("The plaintiff claims that the assignment is ineffective because it was a sham transaction, initiated by Harris for the sole purpose of obtaining superior rights to the mark in the Chicago area. Presumably, Harris sought the assignment because it knew of the plaintiff's prior rights in the mark. Harris did in fact know of the plaintiff's pending registration and it would be naive to conclude that knowledge was completely irrelevant to its decision to seek an assignment from United. . . . Obtaining the assignment from United is consistent with the defendant's documented belief that the plaintiff could not successfully assert nationwide rights in the mark, and therefore another institution was free to use the mark in the Chicago area. We do not believe that an assignment motivated at least in part by sound business judgment should be set aside as a sham transaction").

Assuming the GLOW KIT assignment is valid, this may or may not have an effect on Glow, Inc.'s ability to claim priority as senior user of the GLOW mark. The GLOW KIT trademark registration is limited to "[c]osmetics sold separately and as a kit, namely, alpha hydroxy acid creams, facial cleansing lotions, and skin creams containing vitamin A derivatives." There is no

---

[103]Pearson Decl., ¶ 12. Glow, Inc.'s product catalogue indicates that the company sells moisturizers – i.e., GLOW Face and Hand GLOW – which contain alpha hydroxy acids. (Williamson Decl., ¶ 4, Ex. A.) It does not appear to assert that defendants' GLOW BY J.LO lotion infringes its use of the mark on these products, however.

1  evidence in the record that Glow, Inc.'s Body GLOW lotion incorporates alpha hydroxy acid or

2  vitamin A derivatives, nor is there evidence that it is a facial cleansing cream.  Thus, on the

3  limited record presently before the court, it does not appear that the Lopez's ownership of the

4  GLOW KIT mark will affect the priority analysis.[104]

### (iv)  Geographic Extent Of Glow, Inc.'s Trademark Usage

6  Although Glow, Inc. is likely to succeed in establishing that the GLOW mark is distinctive

7  and that it is the senior user of the mark, it must also demonstrate the territorial scope of its

8  trademark use in order to establish a likelihood of success on the merits.  Generally, "in the

9  absence of federal registration, both parties have the right to expand [their use of an unregistered

10 mark] into unoccupied territory and establish exclusive rights by being first in that territory.  In

11 effect, it is a race between the parties to establish customer recognition in unoccupied territory."

12 4 J. Thomas McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION, § 26:13 (4th

13 ed. 2002).  Compare *Value House v. Phillips Mercantile Co.*, 523 F.2d 424, 429 (10th Cir. 1975)

14 ("[Federal] registration is constructive notice of the registrant's claim of ownership and affords

15 protection which is nationwide and not confined to actual use of the mark").

16 Generally, the senior user of a mark is entitled to assert trademark rights in all areas in

17 which it has legally sufficient market penetration.  This is determined by examining the trademark

18 user's volume of sales and growth trends, the number of persons buying the trademarked product

19 in relation to the number of potential purchasers, and the amount of advertising.  See, e.g.,

20 *Natural Footwear, Ltd. v. Hart, Schaffner & Marx*, 760 F.2d 1383, 1398-99 (3d Cir. 1985)

21 (holding that the senior user had not established trademark rights outside the state of New Jersey).

22 See also *Adray v. Adry-Mart, Inc.*, 76 F.3d 984, 989 (9th Cir. 1996) (holding that a trademark

23 had not acquired secondary meaning outside Orange County, the court noted: "The extent of

24

25 ─────────────────

26 [104]Glow, Inc. argues that the GLOW KIT mark is not confusingly similar to GLOW, as it is
   associated with a medical product sold by a physician through his medical office in Illinois and

27 over the internet, rather than in department stores and boutiques.  (Pl.'s Reply at 13:4-18.)  The
   record is devoid of evidence regarding the extent to which the market for the products overlaps,

28 however.

1   market penetration depends upon the volume of sales, the positive and negative growth trends,

2   the number of people who purchased the party's goods in relation to the number of potential

3   customers, and the amount of advertising"). "Whether a volume of sales is significant will vary

4   with the product and the market. The numbers that result in . . . relief in one case may not be

5   significant in another." *Charles Jacquin Et Cie, Inc. v. Destileria Serralles, Inc.*, 921 F.2d 467,

6   473 (3d Cir. 1990). Market share may also be used to assess whether penetration is legally

7   significant. See *id.* at 473-74.

8       Where the trademark user has acquired a national reputation associated with its mark, it

9   may assert trademark rights even in areas where it has no sales. See, e.g., *Champions Golf Club*

10   *v. Champions Golf Club*, 78 F.3d 1111, 1124 (6th Cir. 1996) (". . . '[m]ere geographical distance

11   is not controlling where the reputation of the senior user's mark has been carried into a trade area

12   prior to the junior user's adoption and use.' If [the senior user] had achieved nationwide

13   recognition, then, even though [the junior user] had not heard of it, [the junior user] could not

14   become an innocent junior user," quoting 4 J. Thomas McCarthy, MCCARTHY ON TRADEMARKS

15   AND UNFAIR COMPETITION, § 26.06 (3d ed. 1995)). See also *Golden Door, Inc. v. Odisho*, 437

16   F. Supp. 956, 962 (N.D. Cal. 1977) (determining that a nationwide injunction should issue under

17   common law, the court noted that "[p]laintiff's service mark has been used since 1958 in

18   connection with its spa in Escondido, California. Although the services are rendered locally,

19   plaintiff has conducted extensive nationwide advertising and promotion with the purpose and

20   effect of drawing clientele from many parts of the country"), aff'd., 646 F.2d 347 (9th Cir.

21   1980), abrogated on other grounds in *Japan Telecom, supra*, 287 F.3d 866.

22       Finally, even if "the senior user cannot prove actual sales penetration into the contested

23   area, and cannot prove that the reputation of its mark extends into that area, it may still make a

24   claim that the junior user is located in an area which falls within the senior user's 'zone of natural

25   expansion.'" 4 J. Thomas McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION,

26   § 26.20 (4th ed. 2002). The "natural zone of expansion," however, is generally defined

27   narrowly. See *Tally-Ho, Inc. v. Coast Community College District*, 889 F.2d 1018, 1028-29

28   (11th Cir. 1989) (holding that a senior user that had used a mark at three community colleges in

1   Florida did not have a zone of expansion that included Dade County, Florida, *inter alia*, because

2   at the time defendant began using the mark there the senior user had not penetrated the cable

3   broadcast market in Dade, had made extremely limited use of the mark, and had not attempted

4   to use it on cable broadcast systems anywhere in Florida); *Accu Personnel v. Accustaff, Inc.*, 846

5   F. Supp. 1191, (D. Del. 1994) (refusing to find a zone of natural expansion in parts of

6   Pennsylvania and Delaware as a result of plaintiff's use of a trademark in southern New Jersey

7   because it failed to adduce any evidence that it had plans to expand into defendant's territory, and

8   noting that "[t]he proper enquiry . . . is into what regions did plaintiff actually plan to expand at

9   the time defendant adopted and began using its trademark").

10   Glow, Inc. offers little evidence regarding the market penetration or sales of the three

11   products at issue.  Specifically, it has proffered no evidence detailing the volume of products it

12   has sold.  Similarly, save for the InStyle and Los Angeles magazine pieces, it has adduced no

13   evidence regarding the manner in which the products have been advertised.[105]  The majority of

14   the evidence it has submitted, which concerns the advertising and sale of GLOW products

15   generally, also provides little information that would assist the court in quantifying market

16   penetration, sales levels, growth trends, or the number of people who purchased the company's

17   products in relation to the number of potential customers.

18   Williamson states that Glow, Inc. began to sell its products at its Los Angeles retail store

19   in 1999, at Bergdorf Goodman in New York City in the Fall of 2000, and on the national beauty

20   website <www.gloss.com> in the Spring of 2000.[106]  She further states that GLOW products are

21   currently sold at an unspecified number of Nordstrom stores and Ritz Carlton Hotels, at retail

22

---

23   [105]Several of the magazine articles proffered mention Glow, Inc.'s bath and body products
24   generally; these references might be interpreted to include the company's shower gel and lotion
     products.  "The Hollywood Reporter" featured Glow Inc.'s bath and body gift pails in November
25   2000.  "Detour" featured Glow bath and body products as newly available at Bergdorf Goodman
     in New York, and "The New York Times Magazine" described the Glow store as "the place for
26   all things lotiony, bathalicious and good smelling" in November 2001. (Williams Decl., ¶ 9, Ex.
27   C.)

28   [106]Williamson Reply Decl., ¶¶ 8, 10.

1    stores in eleven states, and on Glow, Inc.'s website <www.glowspot.com>.[107]   Williamson

2    asserts that GLOW products are physically present in thirteen states, and that sales have been made

3    in all fifty states.  She proffers no evidence, however, as to the volume or level of sales in any

4    location, nor how Glow, Inc.'s market penetration compares with that of its competitors.[108]

5    Williamson also contends that Glow, Inc. has participated in "co-branding ventures" with national

6    companies such as Reebok and Ritz Carlton; once again, however, she does not quantify the sales

7    made as a result of the arrangements, nor specify the geographical territories that they covered.[109]

8    Other than Williamson's general testimony regarding the company's nationwide sales, the record

9    reflects only that Glow, Inc.'s Los Angeles store or certain of its products have been mentioned

10   briefly in a variety of national magazines, including Mademoiselle, Marie Claire, Seventeen and

11   Redbook.  Viewed in its totality, the evidence is not adequate to establish that Glow, Inc. has

12   legally sufficient market penetration in any territory to assert common law trademark rights.

13         Glow, Inc. would not need to establish such penetration if it could demonstrate

14   alternatively that its mark had acquired a national reputation, or a reputation in certain designated

15   geographic areas.  Here again, however, the evidence does not suffice to make the necessary

16   showing.  While Glow, Inc. products are physically present in several states, are available on the

17   internet, and have been mentioned in several national magazines, *the generalized nature of the*

18   *evidence presented precludes drawing inferences regarding the strength of the* GLOW *mark's*

19   *resulting reputation.*

20         Having failed to demonstrate that it will likely prove it has common law trademark rights

21   in any particular geographic area, Glow, Inc. also may not argue that GLOW BY J.LO products

22   infringe because they are being marketed in its "natural zone of expansion."  Williamson asserts

23   that Glow, Inc. has recently negotiated with venture capital firms to expand the presence of GLOW

24

25   ───────────────

26         [107]Williamson Decl., ¶ 6.

27         [108]Williamson Reply Decl., ¶ 11.

28         [109]Williamson Decl., ¶ 9; Williamson Reply Decl., ¶ 3.

1  products in the marketplace.[110]   She further asserts that Glow, Inc. has recently discussed

2  nationwide distribution of GLOW products with two major department stores.[111]   Based on these

3  comments, Glow, Inc. presumably argues that its "zone of natural expansion" is nationwide. See

4  *Accu Personnel v. Accustaff, Inc.*, 846 F. Supp. 1191, 1209 (D. Del. 1994) ("The proper inquiry

5  . . . is into what regions did plaintiff actually plan to expand at the time defendant adopted and

6  began using its trademark").

7          Awarding common law trademark rights based on a "zone of natural expansion"

8  presupposes, however, that the trademark user has already penetrated the market in at least some

9  geographic areas and established a presence there.   Indeed, it is only after existing zones of

10  market penetration are determined that natural zones of expansion can be identified. See *Tally-*

11  *Ho*, *supra*, 889 F.2d at 1028 ("[T]here are few firm guidelines to define the senior user's

12  imaginary zone of natural expansion.   However, several criteria seem relevant: (1) How great

13  is the geographical distance from the senior user's actual location to a point on the perimeter of

14  the zone of expansion? (2) What is the nature of the business?   Does it already have a large or

15  small zone of actual market penetration or reputation? (3) What is the history of the senior user's

16  past expansion?   Has it remained static for years, or has it continually expanded into new

17  territories?   Extrapolating prior expansion, how long would it take the senior user to reach the

18  periphery of the expansion zone he claims? (4) Would it require an unusual 'great leap forward'

19  for the senior user to enter the zone, or is the zone so close to existing locations that expansion

20  would be (or is) a logical, gradual, step of the same length as those previously made?"). Because

21  Glow, Inc. has not adequately demonstrated the extent of its current market penetration, a zone

22  of expansion that encompasses the entire nation is about as large a "leap" as it is possible to

23  imagine.  Considering both evidence of actual market penetration and possible areas of expansion,

24

25  _____

26      [110]Williamson Decl., ¶ 8

27      [111]*Id.*, ¶ 7; Williamson Reply Decl., ¶ 14.   Williamson maintains these negotiations were
    tabled once the release of GLOW BY J.LO products was announced. (Williamson Decl., ¶ 8;
28  Williamson Reply Decl., ¶ 14.)

1   therefore, the court concludes that Glow, Inc. has not demonstrated it is likely to prove national

2   rights to the GLOW mark.  Moreover, on the present record, the court cannot conclude that it is

3   likely to prove sufficient market penetration in any particular geographic area to claim common

4   law trademark rights as the senior user in that territory.

5              **2.     Likelihood Of Confusion**

6         While the court has determined that Glow, Inc. is not likely to prove that GLOW is a

7   protectable trademark, it will nonetheless examine whether defendants' use of GLOW BY J.LO will

8   likely confuse the consuming public as to the source of the parties' products.  "The test for

9   likelihood of confusion is whether a 'reasonably prudent consumer' in the marketplace is likely

10  to be confused as to the origin of the good or service bearing one of the marks."  *Dreamwerks*,

11  *supra*, 142 F.3d at 1129 (footnote omitted).  In *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341,

12  348-49 (9th Cir. 1979), the Ninth Circuit identified eight factors that should be used in conducting

13  this inquiry: (1) the strength of the mark; (2) the proximity or relatedness of the goods; (3) the

14  marks' similarity in appearance, sound, and meaning; (4) evidence of actual confusion; (5) the

15  degree to which the parties' marketing channels converge; (6) the type of goods and the degree

16  of care customers are likely to exercise in purchasing them; (7) evidence of the defendants'

17  intention in selecting and using the allegedly infringing name; and (8) the likelihood that the

18  parties will expand their product lines.  "The factors should not be rigidly weighed"

19  (*Dreamwerks*, *supra*, 142 F.3d at 1129), but rather "are intended to guide the court in assessing

20  the basic question of likelihood of confusion" (*E. & J. Gallo Winery*, *supra*, 967 F.2d at 1290).

21  The court need not address all of the factors, nor must plaintiff establish that each weighs in its

22  favor in order to establish a likelihood of confusion. See *C & C Organization v. AGDS, Inc.*, 676

23  F. Supp. 204, 206 (C.D. Cal. 1987) (citing *Apple Computer, Inc. v. Formula International, Inc.*,

24  725 F.2d 521, 526 (9th Cir. 1984)).

25        Some of the *Sleekcraft* factors will be more important in certain contexts than in others.

26  See, e.g., *Goto.com v. Walt Disney Co.*, 202 F.3d 1199, 1205 (9th Cir. 2000).  The Ninth Circuit

27  has suggested that three *Sleekcraft* factors are especially pertinent in reverse confusion cases:

28  (1) the strength or arbitrariness of the mark; (2) the relatedness of the parties' goods; and (3) the

34

1 │ similarity of the marks. See *Dreamwerks*, *supra*, 142 F.3d at 1130. The court will consider these

2 │ and the other relevant factors in turn below.

### a.   Strength Of The Mark

### (1)   Distinctiveness

"The strength of a given mark rests on its distinctiveness." *Miss World (UK) Ltd. v. Mrs. America Pageants, Inc.*, 856 F.2d 1445, 1448 (9th Cir. 1988). The court has already determined that the GLOW mark will most probably be found to be suggestive. Glow, Inc. thus cannot claim broad protection for its mark, and should have anticipated some confusion with legitimate competitors as a consequence. *Dreamwerks*, *supra*, 142 F.3d at 1130 ("Had Dreamwerks chosen a descriptive mark like Sci-Fi Conventions Inc., or a suggestive mark like Sci-Fi World, some confusion with the marks of legitimate competitors might be expected").[112]

---

[112]While, as noted *infra*, the court evaluates the commercial strength of the junior user's mark in a reverse confusion case, the conceptual strength test continues to focus on the senior user's mark. See *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 231 (3d Cir. 2000) (". . . in the paradigmatic reverse confusion case, the senior user has a commercially weak mark when compared with the junior user's commercially strong mark. When it comes to conceptual strength, however, we believe that, just as in direct confusion cases, a strong mark should weigh in favor of a senior user. Our decision is supported by the fact that those courts that have clearly distinguished conceptual from commercial strength in the reverse confusion context have weighed a conceptually strong mark in the senior user's favor, in the same manner as they would in direct confusion cases," citing *Worthington Foods, Inc. v. Kellogg Co.*, 732 F. Supp. 1417, 1456 (S.D. Ohio 1990), and *H. Lubovsky, Inc. v. Esprit de Corp.*, 627 F. Supp. 483, 487 (S.D.N.Y. 1986)); *id.* (". . . as in direct confusion claims, a district court [judging a reverse confusion case] should weigh a conceptually strong mark in the plaintiff's favor, particularly when the mark is of such a distinctive character that, coupled with the relative similarity of the plaintiff's and defendant's marks, a consumer viewing the plaintiff's product is likely to assume that such a mark would only have been adopted by a single source – i.e., the defendant"). Focusing the conceptual strength test on plaintiff's mark, and the commercial strength test on defendant's mark avoids the anomalous result against which defendants caution (see Defs.' Opp. at 13-14) – i.e., that a small plaintiff with a weak mark will be able more easily to prove likelihood of confusion than a large company with a strong distinctive mark and high market penetration. See *Chattanoga Mfg., Inc. v. Nike, Inc.*, 140 F. Supp. 2d 917, 927, n. 10 (N.D. Ill. 2001) ("Nike urges us to consider the strength of Chattanoga's mark because, to do otherwise, would work 'a perverse result,' i.e. 'less imaginative marks (i.e. "Jordan") would be more likely to win reverse confusion claims than arbitrary or fanciful marks (e.g. KODAK).' . . . To address this potential anomalous result, the Third Circuit considers both a mark's commercial

## (2)   Commercial Strength

"'Placement on the spectrum of distinctiveness does not end the enquiry as to the strength of a mark: it is only the first step.  The second step is to determine the strength of th[e] mark in the marketplace.  That is, its degree of recognition in the minds of the relevant customer class.'" *Miss World*, *supra*, 856 F.2d at 1449 (quoting 1 J. McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION, § 11:1 (2d ed. 1984)).  See also *Petro Shopping Centers v. James River Petroleum, Inc.*, 130 F.3d 88, 93 (4th Cir. 1997) (". . . the placement of a mark in either the suggestive or descriptive category is merely the first step in assessing the strength of a mark for purposes of likelihood of confusion test. . . .  [C]ourts must examine, in addition to the mark's characterization as suggestive or descriptive, the extent of secondary meaning a mark has acquired in the eyes of consumers"); *Fisons Horticulture, Inc. v. Vigoro Industries, Inc.*, 30 F.3d 466, 479 (3d Cir. 1994) ("Distinctiveness on the scale of trademarks is one measure of a mark's strength. . . .  Commercial strength, or marketplace recognition of the mark, is another"); *John J. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 975 (11th Cir. 1983) (the distinctiveness of the mark and the extent of third-party use "both . . . should be considered when analyzing the strength of a particular trademark"); *Sun Banks of Florida, Inc. v. Sun Federal Savings & Loan Ass'n.*, 651 F.2d 311, 315 (5th Cir. 1981) (after holding that plaintiff's mark was arbitrary, the court stated: "The ultimate strength of a mark, [however,] the key inquiry before us, is determined by a number of factors which establish its standing in the marketplace"); 2 J. McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION, § 11.83 (4th ed. 1999) ("While some courts have made the strong-weak evaluation solely upon the place of a term on the spectrum of marks, such an approach is incomplete.  One must in addition look at the marketplace

---

and conceptual strength. . . .  Specifically, a plaintiff with a commercially weak mark is more likely to prevail on a reverse confusion claim than a plaintiff with a stronger mark.  On the other hand, a conceptually strong mark weighs in the plaintiff's favor.  We believe that this two-prong approach to the strength of mark determination would adequately address Nike's concern of 'perverse results' and, in fact, mirrors Defendants' own proposal to consider the strength of the junior user's mark in considering advertising and promotion but to measure the conceptual strength of the senior user," citing *A & H Sportswear*, *supra*, 237 F.3d at 230-32).

1    strength of the mark at the time of the litigation or at the time registration is sought").

2        Ordinarily, this test is applied to the senior user's mark.  In a case of reverse confusion

3    such as this one, however, the senior user's mark is usually weaker than the junior user's.  See

4    *Cohn v. Petsmart, Inc.*, 281 F.3d 837, 841 (9th Cir. 2002); *Walter v. Mattel, Inc.*, 210 F.3d

5    1108, 1111, n. 2 (9th Cir. 2000); *Dreamwerks, supra*, 142 F.3d at 1130; *Fisons Horticulture*,

6    *supra*, 30 F.3d at 479-80.  Thus, a court should "evaluate the strength of the junior user's mark

7    so as to gauge its ability to overpower the senior user's mark."  3 J. McCarthy, MCCARTHY ON

8    TRADEMARKS AND UNFAIR COMPETITION, § 23:10 (4th ed. 2002) (citing *Dreamwerks, supra*, 142

9    F.3d at 1130, n. 5); see also *Checkpoint Systems, Inc. v. Check Point Software Technologies,

10   Inc.*, 269 F.3d 270, 303 (3d Cir. 2001) (holding that in a reverse confusion case, "[w]hile

11   analysis of the strength of the senior user's mark is relevant, the more important inquiry focuses

12   on the junior user's mark.  [T]he lack of commercial strength of the smaller senior user's mark

13   is to be given less weight in the analysis because it is the strength of the larger, junior user's mark

14   which results in reverse confusion. . ." (internal quotation marks and citations omitted)); *A & H

15   Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 231 (3d Cir. 2000) (". . . in a

16   reverse confusion claim, a court should analyze the              factor in terms of

17   (1) the commercial strength of the junior user as compared to the senior user; and (2) any

18   advertising or marketing campaign by the junior user that has resulted in a saturation in the public

19   awareness of the junior user's mark");[113] *Sunenblick v. Harrell*, 895 F. Supp. 616, 627 (S.D.N.Y.

20   1995) ("It is the essence of reverse confusion that the senior user's mark will be comparatively

21   weaker – and quite probably much weaker indeed – than that of the powerful junior user.  It is

22   in such cases, where the visibility and strength of the junior user's mark have occupied the field,

23   that the consumer is likely to consider the senior user's product as either emanating from the

24

---

25       [113]The court noted, however, that in reverse confusion cases, "as in direct confusion

26   claims, a district court should weigh a conceptually strong mark in the plaintiff's favor,
     particularly when the mark is of such a distinctive character that, coupled with the relative

27   similarity of the plaintiff's and defendant's marks, a consumer viewing the plaintiff's product is
     likely to assume that such a mark would only have been adopted by a single source – i.e., the

28   defendant."  *Id.* at 232.

1   junior user or infringing upon the junior user's trademark rights.  Consequently, the court should

2   properly examine the strength of the junior user's mark"), aff'd., 101 F.3d 684 (2d Cir. 1996).

3   The court must therefore assess the commercial strength of defendants' GLOW BY J.LO mark in

4   determining likelihood of confusion.

5          Key factors in conducting this evaluation the comparative commercial strength of the junior

6   and senior users and any advertising or marketing campaign by the junior user that has resulted

7   in "a saturation in the public awareness of the junior user's mark." *A & H Sportswear*, *supra*,

8   237 F.3d at 231.  See also *Checkpoint Systems*, *supra*, 269 F.3d at 303 ("Courts should look at

9   the commercial strength of the junior user's mark to determine whether its advertising and

10  marketing has resulted in a 'saturation in the public awareness of the junior user's mark'");

11  *Fisons*, *supra*, 30 F.3d at 479 ("In reverse confusion, the junior user is typically a wealthier,

12  more powerful company who can overwhelm the market with advertising.  An aggressive junior

13  user may thereby achieve greater commercial strength in a short period of time than the senior

14  user has after years of marketing its product"); *Altira Group LLC v. Philip Morris Companies*

15  *Inc.*, 207 F. Supp. 2d 1193, 1204 (D. Colo. 2002) ("With respect to commercial strength, Philip

16  Morris's mark is likely to be strong as it has traditionally spent large sums of money on

17  advertising campaigns.  For instance, it spent an estimated $200 million advertising a 'feel good'

18  campaign promoting its 'Philip Morris' mark.  Altira Group argues it is likely that Philip Morris

19  will spend even more money to advertise its new name 'ALTRIA' while it attempts to distance

20  itself from being known only as a tobacco company.  According to Altira, Philip Morris's

21  self-proclaimed goal is to 'create 90% awareness of name change in the investment community

22  among active investors by end of 2002.' . . .  Philip Morris does not respond to this contention

23  because it analyzes the strength of the [senior] user's mark, as in cases of forward confusion.  I

24  agree with Altira that the ALTRIA mark would be strong").

25         Applying such an analysis here, it is immediately apparent that Coty and Jennifer Lopez

26  are stronger commercially than Glow, Inc.  Coty is one of the world's leading manufacturers and

27  marketers of women's and men's fragrances, cosmetics and skin care products.  Its prestige

28  division, Lancaster Group, manufactures and markets fragrance and cosmetic brands in nine

European countries and the United States.[114]  Coty's worldwide sales in 2002 were $1.65 billion;
Advertising Age Magazine has estimated that Coty is the fifty-ninth largest advertiser in the
world.[115]  Coty's prestige brands include Lancaster, Davidoff, Joop!, Chopard, Jil Sander, Yue-
Sai Kan, Isabella Rossellini's Manifesto, Vivienne Westwood Boudoir and Glow by J.Lo.[116]  The
GLOW BY J.LO product line is currently being sold in the United States, France, Benelux, Israel,
Germany, Austria and Switzerland.[117]  Sales in the United States reached $17.9 million by the end
of September, and Coty estimates that they will total approximately $47 million by the end of
fiscal year 2003.[118]  Lopez is an internationally known celebrity who has released three successful
music albums, including "J.Lo" and "J to tha L-O!"  Additionally, she has starred in a number
of major motion pictures, including "Selena," "Out of Sight," "The Wedding Planner," and
"Enough."[119]  Coty estimates that the public's fascination with Lopez has created an "added
value" of $4 million for the GLOW BY J.LO line.[120]

By contrast, Glow, Inc. has a relatively limited sales presence in a handful of states and
on the internet.[121]  Glow, Inc. readily concedes that it is unable to match defendants' commercial
expenditures.[122]  No GLOW products are currently sold internationally, although Glow, Inc. has
begun to negotiate with department stores in the United Kingdom and Japan.[123]

---

[114]Walsh Decl., ¶ 2.

[115]Williamson Reply Decl., ¶¶ 18, 21-22.

[116]Walsh Decl., ¶ 2.

[117]*Id.*, ¶ 16.

[118]*Id.*, ¶ 17.

[119]*Id.*, ¶ 4.

[120]*Id.*, ¶ 12.

[121]See Williamson Reply Decl., ¶ 11.

[122]*Id.*, ¶ 18.

[123]*Id.*, ¶ 12.

1    In addition to the disparity in commercial strength, the record demonstrates that Glow, Inc.

2  has developed the market for its products using relatively low budget marketing techniques – i.e.,

3  sending gift baskets to celebrities, securing free publicity in women's magazines, co-branding

4  ventures with prominent companies, and other "grass-roots" methods.[124] Defendants, by contrast,

5  have expended substantial monies advertising the GLOW BY J.LO line.  Coty's current investment

6  in manufacturing, marketing and promoting the GLOW BY J.LO products is approximately $29.5

7  million.[125]    Advertising expenditures to date are estimated at $5.2 million, although some

8  additional media coverage has been generated without cost because of Lopez's affiliation with the

9  product.[126]  Defendants have promoted the products on national television and radio, and through

10  billboards, magazines and newspaper advertisements.[127]  Given their advertising expenditures to

11  date, defendants can be expected to incur significant promotional costs during the upcoming

12  holiday season.

13    Based on their commercial strength and reputations, and the advertising expenditures they

14  have made to promote the GLOW BY J.LO line, the court concludes that defendants' product line

15  is likely to overwhelm plaintiff's in the market to the extent they are in competition with one

16  another.  See *Cohn, supra,* 281 F.3d at 841 ("Petsmart's extensive advertising gives it the ability

17  to overwhelm any public recognition and goodwill that Cohn has developed in the mark"); *Walter,*

18  *supra,* 210 F.3d at 1111, n. 2 ("In a reverse confusion case . . . the issue is whether the junior

19  mark is so strong as to overtake the senior mark").  This fact is offset, however, by the relative

20  weakness of Glow, Inc.'s mark, which is suggestive only, and which competes in an exceedingly

21  crowded field of beauty products using the word "glow" in some manner as a trade name or

22  trademark.  See *E. & J. Gallo Winery, supra,* 967 F.2d at 1291 (suggestive marks are given

23

24  _____

25    [124]Williamson Reply Decl., ¶¶ 3, 18.

26    [125]Walsh Decl., ¶ 26.

27    [126]Walsh Decl., ¶ 12.

28    [127]Williamson Reply Decl., ¶ 18.

1 moderate protection); *Nutri/System, Inc. v. Con-Stan Industries, Inc.*, 809 F.2d 601, 605 (9th Cir.

2 1987) (same); *Franklin Resources, Inc. v. Franklin Credit Management Corp.*, 988 F. Supp. 322,

3 328 (S.D.N.Y. 1997) (". . . 'a finding of suggestiveness does not guarantee a determination that

4 the mark is a strong one. Although a suggestive mark is entitled to registration without evidence

5 of secondary meaning, suggestiveness is not necessarily dispositive of the issue of the strength of

6 the mark.' . . . In the case at bar, the duration and volume of the business that Franklin

7 Resources has done under the name 'Franklin' militate in favor of the strength of its mark. On

8 the other hand, Franklin Credit has shown extensive use of the name 'Franklin' by third parties

9 engaged in one aspect or another of the financial service industry. Defendant produced a chart

10 listing 65 such companies culled from the Yellow Pages of telephone directories. Plaintiff says

11 that this list of names proves very little as to what these third parties do or with whom they do it,

12 but the list of names is probative of seemingly widespread usage of the name 'Franklin' in

13 connection with such activities or services, prompted, one may reasonably infer, by an esteem

14 third parties share with the plaintiff for Benjamin Franklin. It is well settled that third-party

15 registration and use dilutes the strength of a trademark. . . . That dissolution is significant in the

16 case at bar"). See also *Estee Lauder Inc. v. The Gap, Inc.*, 108 F.3d 1503, 1509-11 (2d Cir.

17 1997) (while upholding the district court's finding that Estee Lauder's "100% Time Release

18 Moisturizer" mark was suggestive, the court reversed its finding that the mark was strong, as

19 Lauder's use of 100% was not original, it conceded that consumers did not associate the term with

20 Lauder, and there were more than seventy trademark registrations, pending applications for

21 registration or renewal, or publications-for-opposition that incorporated the term 100%, some of

22 which were for cosmetic products); *Harlem Wizards Entertainment Basketball, Inc. v. NBA

23 Properties, Inc.*, 952 F. Supp. 1084, 1097 (D.N.J. 1997) ("This Court has already determined

24 that the mark WIZARDS is suggestive and therefore, inherently distinctive. Nonetheless, this

25 categorization of plaintiff's mark does not in and of itself establish that plaintiff's mark is strong

26 and that the likelihood of confusion exists. Although plaintiff's mark is distinctive, it is

27 undeniably commercially weak. . . . In evaluating this likelihood-of-confusion factor, the Court

28 does not hold plaintiff to the same standard as defendants who have the financial ability to expend

41

1   large sums of money on promotion and advertising.  Nonetheless, the Court finds that the inherent

2   distinctiveness of plaintiff's mark does not override its marked commercial weakness, even when

3   this factor is weighed more heavily.  Because the mark is weak it fails to identify plaintiff's

4   services with a particular source.  Therefore, the Court finds that this factor favors the

5   defendants"); *Worthington Foods, Inc. v. Kellogg Co.*, 732 F. Supp. 1417, 1456 (S.D. Ohio

6   1990) (holding that the strength of mark factor did not favor a finding of likelihood of confusion

7   in a reverse confusion case, *inter alia*, because the HEARTWISE mark was "not, by its inherent

8   nature, a 'strong' mark; it [was] neither fanciful nor arbitrary").

9       The key question in such a case is whether consumers who encounter Glow, Inc.'s

10  products will believe that they are associated with defendants' GLOW BY J.LO line. See *Walter*,

11  *supra*, 210 F.3d at 1110 ("'The question in such cases is whether consumers doing business with

12  the senior user might mistakenly believe that they are dealing with the junior user,'" quoting

13  *Dreamwerks, supra*, 142 F.3d at 1130); 3 J. Thomas McCarthy, MCCARTHY ON TRADEMARKS

14  AND UNFAIR COMPETITION, § 23:10 (4th ed. 2002) ("In a reverse confusion case, it makes more

15  sense to evaluate whether persons familiar with the junior user's stronger mark, and who

16  encounter the senior user's weaker and less well-known mark, associate it with the junior user's

17  mark").  Here, given the relative conceptual weakness of the mark and the number of

18  fragrance/lotion products in the market that use the word "glow" in some fashion in their

19  trademark or trade name, it is not immediately clear that consumers will make this association.

20  See *A & H Sportswear Co., Inc. v. Victoria's Secret Stores, Inc.*, 167 F. Supp. 2d 770 (E.D. Pa.

21  2001) (noting that the strength of the mark factor "favors the senior user when there is a

22  commercially strong junior user who adopts a conceptually strong mark").

23      Accordingly, while defendants' commercial strength is likely to overwhelm plaintiff in the

24  marketplace to the extent their products compete, the court concludes that Glow, Inc. will not

25  likely be able to prove that the strength of the mark factor favors a finding of likelihood of

26  confusion because its own mark is conceptually weak and operates in a crowded field.

27              **b.    Proximity Or Relatedness Of The Parties' Goods**

28      "Related goods are those 'products which would be reasonably thought by the buying

42

1  public to come from the same source if sold under the same mark.'" *Sleekcraft, supra*, 599 F.2d

2  at 348, n. 10 (quoting *Standard Brands, Inc. v. Smidler*, 151 F.2d 34, 37 (2d Cir. 1945));

3  *Fleischmann Distilling Corp. v. Maier Brewing Co.*, 314 F.2d 149, 159 (9th Cir. 1963) ("The

4  use need not be the same as, nor one in competition with the original use. The question is, are

5  the uses related so that they are likely to be connected in the mind of a prospective purchaser?").

6  See also *Brookfield Communications, supra*, 174 F.3d at 1056 (holding that because "both

7  companies offer products and services relating to the entertainment industry generally, and their

8  principal lines of business both relate to movies specifically," there was sufficient relatedness of

9  goods to support a finding of likelihood of confusion); 4 J. McCarthy, MCCARTHY ON

10  TRADEMARKS AND UNFAIR COMPETITION, § 24.24 (4th ed. 2002) ("Goods are 'related' if

11  consumers are likely to mistakenly think that the infringer's goods come from the same source

12  as the senior user's goods or are sponsored or approved by the senior user").

13       The GLOW and GLOW BY J.LO product lines are clearly related. While Glow, Inc.'s line

14  is broader, both companies offer lotion, shower gel, and fragrance products.[128] Indeed, many of

15  the natural oils used to create the GLOW BY J.LO fragrance – e.g., orange flower, grapefruit,

16  rose, sandalwood, amber, jasmine, and vanilla – are found in GLOW products as well.[129] "GLOW

17  Scent" perfume may be purchased in sandalwood, and both "Body GLOW" lotion and "Wash &

18  GLOW" shower gel may be purchased in grapefruit, orange-vanilla, or sandalwood scents.[130]

19       The products are also sold at comparable prices, and are thus accessible to comparable

20  groups of consumers. The suggested retail price for GLOW BY J.LO eau de toilette is $50 for 3.4

21  ounces, $38.50 for 1.7 ounces, and $29.50 for 1.02 ounces. The suggested retail price for GLOW

22

23

---

24

25  [128]Defendants note that their primary fragrance product is a eau du toilette while plaintiff's is a perfume. As Williamson aptly notes, the terms "cologne, eau de toilette, and perfume" are generally used interchangeably by the consuming public. (Williamson Reply Decl., ¶ 5.)

26

27  [129]*Id.*, ¶ 6.

28  [130]Williamson Decl., Ex. A.

1    BY J.LO lotion is $25, while the shower gel is intended to retail at $20.[131]   GLOW perfume is

2    priced at $42 for 0.5 ounces; Glow, Inc.'s lotion is priced at $22; and its shower gel is priced at

3    $16 for an 8 ounce bottle.[132]   While the record contains no evidence that the products are sold in

4    the same stores, each line is available in upscale department stores and specialty boutiques that

5    cater to high-end retail customers.[133]

6           Defendants argue the products are not related because they appeal to different customer

7    groups.  They describe GLOW BY J.LO as a "mass department store fragrance line," and contrast

8    this with Glow, Inc.'s "natural aromatherapy alternative products" and "no-frills 'niche'

9    products."[134]  Glow, Inc.'s catalog states that the company is "obsessive about the sanctity of the

10   bathing ritual," that its products are "made from the highest quality natural ingredients" and that

11   they are "mixed, packaged and labeled by hand."[135]  Several magazine articles discussing GLOW

12   products have reiterated these concepts.  InStyle magazine stated: "Don't let the plain bottles and

13   simple labels fool you.  These bath and body products from the Glow store in L.A. are truly

14   indulgent."  The New York Times Magazine stated that Glow is "the place for all things lotiony,

15   bathalicious and good smelling, where nothing is made from chemicals."  A blurb in

16   Entertainment Weekly, which appeared after this suit was filed, described Glow, Inc.'s line as

17   "natural bath and body products," and quoted Williamson's statement that the company's

18   "presentation is all about simplicity[;] . . . what's inside the bottles is really the star."[136]

19   Defendants contend this evidence demonstrates that the products are distinguishable, as Coty does

20   not "plan[ ] to use [the] GLOW BY J.LO [mark] for a 'natural alternative' niche line of

21

22          [131]Walsh Decl., ¶ 15.

23          [132]Williamson Decl., Ex. A.  While Glow, Inc.'s fragrance prices are somewhat higher,
     this is attributable to the fact that its product is a perfume rather than a eau de toilette.

24

25          [133]See *infra* at 55-56.

26          [134]Defs' Opp. at 16:26-27.

27          [135]Williamson Decl., Ex. A.

28          [136]Williamson Decl., ¶ 9, Ex. C.

1    products."[137]

2       Courts have held that the mere fact that "two products or services fall within the same

3 general field . . . does not mean that the two products or services are sufficiently similar to create

4 a likelihood of confusion." *Harlem Wizards Entertainment Basketball, supra*, 952 F. Supp. at

5 1095 ("Meaningful differences between the products and services are often cited as a factor

6 tending to negate reverse confusion, even when the products are superficially within the same

7 category). In *Sunenblick v. Harrell*, 895 F. Supp. 616 (S.D.N.Y. 1995), aff'd., 101 F.3d 684

8 (2d Cir. 1996), for example, the court found that plaintiff's and defendant's use of the UPTOWN

9 RECORDS mark for music recordings did not create a likelihood of confusion because "[plaintiff]'s

10 products [were] addressed to a somewhat esoteric market, viz., purchasers interested in lost or

11 forgotten jazz artists, in the 'straight ahead jazz' category, whereas defendants sell rap

12 recordings," and because *the distinct recordings were "featured in different sections of the stores*

13 *. . . according to genre and not by label name." Id.* at 629. See also *Harlem Wizards*

14 *Entertainment Basketball, supra*, 952 F. Supp. at 1095 ("The show basketball performed by

15 plaintiff is markedly distinct from NBA competitive basketball in myriad ways. As a show

16 basketball team, plaintiff simply does not play NBA level competitive basketball. . . . Therefore,

17 the court finds that when every aspect of the two teams is compared, there is glaring

18 dissimilarity").

19       There is no evidence in the present record that would support a finding that purchasers of

20 "mass department store" fragrances or lotions are not also potential purchasers of natural,

21 aromatherapy products. The products are sold in the same types of stores – i.e., upscale

22 department and high end specialty stores – and are used for the same purposes. See 4 J.

23 McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION, § 24.22 (4th ed. 2002)

24 ("One way to define 'competitive' goods is that they are goods that are reasonably interchangeable

25 by buyers for the same purposes"). Because defendants' "use need not be the same as, nor one

26 in competition with the original use," and because the key "question is, are the uses so related that

27 ───────────────

28    [137]Walsh Decl., ¶ 8.

1  they are likely to be connected in the mind of a prospective purchaser" (*Fleischmann Distilling*

2  *Corp.*, *supra*, 314 F.2d at 159), the court concludes that Glow, Inc. will likely be able to prove

3  the products are related in a trademark sense.  See *Dreamwerks*, *supra*, 142 F.3d at 1131 (". . .

4  the relatedness of each company's prime directive isn't relevant.  Rather, we must focus on

5  Dreamwerks' customers and ask whether they are likely to associate the conventions with

6  DreamWorks the studio.  Entertainment studios control all sorts of related industries: publishing,

7  clothing, amusement parks, computer games and an endless list of toys and kids' products.  In this

8  environment it's easy for customers to suspect DreamWorks of sponsoring conventions at which

9  movie merchandise is sold").  See also *Checkpoint Systems*, *supra*, 269 F.3d at 302, n. 32 ("The

10  proper inquiry in a reverse confusion claim is whether consumers will assume the senior user's

11  goods are associated with the junior user.  Just as in a direct confusion claim, the relatedness of

12  the parties' products is integral to the finding of likely confusion.  If two products are unrelated,

13  there is little reason to assume confusion since most consumers would not assume that a single

14  company would market two completely unrelated products.  On the other hand, when the goods

15  are related, a customer might reasonably assume the junior user with a strong market presence

16  would sell both products").

17        In the instant case, consumers could well believe that a "mainstream" cosmetics company

18  like Coty had expanded into the "natural, aromatherapy" market.  See *Cohn*, *supra*, 281 F.3d

19  at 841 (holding that parties' goods and services were related, as plaintiff "provides veterinary

20  services and makes ancillary sales of pet supplies, while Petsmart sells pet supplies and offers

21  ancillary veterinary services through Dr. Barton").  Compare *Checkpoint Systems*, *supra*, 269

22  F.3d at 302, n. 32 ("The District Court recognized that consumers of [defendant's] highly

23  sophisticated technical computer security systems would have no reason to believe that [plaintiff's]

24  physical article surveillance system was manufactured by [defendant].  Because the 'computer

25  information' niche that [defendant] operated in was unique and technical there is no reason to

26  believe a consumer would assume that [it] had expanded into the market for a different type of

27  security product.  The same is true of [plaintiff's] customers.  Because of the complicated

28  technology involved in the 'computer information' niche, these customers would not assume that

1 [plaintiff] had moved into this market"). Accordingly, this factor favors a finding of likelihood

2 of consumer confusion.

3                **c.**    **Similarity Of The Marks**

4     "Similarity of the marks is tested on three levels: sight, sound, and meaning." *Sleekcraft*,

5 *supra*, 599 F.2d at 351. In judging similarity, trademarks should be considered as they are

6 encountered in the marketplace, taking into account the normal circumstances surrounding

7 purchase of the type of goods they represent. *Id.*; *Lindy Pen Co. v. Bic Pen Corp.*, 725 F.2d

8 1240, 1245 (9th Cir. 1984), cert. denied, 469 U.S. 1188 (1985); *Walt Disney Productions v. Air*

9 *Pirates*, 581 F.2d 751, 759 (9th Cir. 1978).

10     The sound and meaning of the two marks is clearly similar, as both use the word "glow"

11 to evoke images of glowing skin and positive feelings associated with use of the companies'

12 fragrances. Defendants argue, however, that their use of "glow" in conjunction with the

13 distinctive celebrity mark "J.Lo" reduces the likelihood that consumers will confuse Glow, Inc.'s

14 products with their own. It is true that marks may not be dissected, but must be compared in their

15 entirety. See 3 J. McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION, § 23.43

16 (4th ed. 2002); *Official Airline Guides, Inc. v. Goss*, 6 F.3d 1385, 1392 (9th Cir. 1993) ("The

17 marks must be considered in their entirety and as they appear in the marketplace"); *A & H*

18 *Sportswear Co., supra*, 167 F. Supp. 2d at 780 (same). In the reverse confusion context,

19 however, the addition of a celebrity "housemark" to an allegedly infringing mark may heighten

20 confusion rather than reduce it. See *Americana Trading, Inc. v. Russ Berrie & Co.*, 966 F.2d

21 1284, 1288 (9th Cir. 1284) ("[T]he prominence of Russ's housemark may serve to create reverse

22 confusion that Russ, and not Amtra, is the source of Amtra's 'Wedding Bears.' Russ's

23 housemark therefore does not, as a matter of law, render its use of 'Wedding Bear' non-similar

24 to Amtra's trademark. . . . Indeed, use by Russ of its housemark along with Amtra's trademark

25 may 'be an aggravation and not a justification, for it is openly trading in the name of another upon

26 the reputation acquired by the device of the true proprietor'"). See also *A & H Sportwear, supra*,

27 237 F.3d at 229 ("As to the presence of the housemark on the Victoria's Secret product, not only

28 is there the possibility that consumers will fail to remember the mark when encountering A & H's

swimwear, but there is also the possibility that the mark will *aggravate*, rather than mitigate, reverse confusion, by reinforcing the association of the word 'miracle' exclusively with Victoria's Secret"); *Sands, Taylor & Wood Co. v. The Quaker Oats Co.*, 978 F.2d 947, 959 (7th Cir. 1992) ("[I]t is precisely the strong association between Gatorade and 'Thirst Aid' created by Quaker's ads that is likely to create confusion in this case. Under the circumstances, the linking of the plaintiffs' mark with the defendant's brand name is an aggravation, not a justification").

Here, while no evidence of actual consumer reaction has been adduced by either party, it appears that "J.Lo" may be the dominant portion of defendants' composite mark, given Lopez's high profile in the entertainment world, and the relatively commonplace use of "glow" within the cosmetics industry. Given the reverse confusion context, however, the court cannot conclude, in the absence of survey or other evidence of consumer reaction to the products as encountered in the marketplace, that the addition of the "J.Lo" housemark mitigates the likelihood of consumer confusion. Cf. *A & H Sportwear*, *supra*, 167 F. Supp. 2d at 780 (declining to adopt a *per se* rule that the junior user's addition of a housemark aggravates confusion in a reverse confusion case, and stating that "[t]he better approach is to look at whether the housemark increases or decreases consumer confusion in the particular case").  But see *Cohn*, *supra*, 281 F.3d at 842 (holding that there was no likelihood of confusion in a reverse confusion case, *inter alia*, because both plaintiff and defendant used the trademark "WHERE PETS ARE FAMILY" with distinctive housemarks, i.e., Critter Clinic and Petsmart, which provided the "dominate commercial identity" and reduced the potential for confusion).  On the present record, the sound and meaning of the marks must be viewed as similar for purposes of this preliminary injunction proceeding.

As they appear on the parties' products, however, the marks are visually distinct. GLOW perfume is packaged in a small, dark apothecary-style bottle, which is placed inside a white box. Both the box and the bottle bear the same identifying label.[138]  GLOW BY J.LO eau de toilette is packaged in a stylized bottle of frosted glass, around which is draped a silver necklace with the

---

[138]*Id.*, Ex. 48 (GLOW perfume bottle and box).

1   "J.Lo" insignia. This bottle is placed inside a white box that bears the GLOW BY J.LO mark.[139]

2   GLOW shower gel is packaged in a clear cylindrical bottle, while GLOW BY J.LO shower gel is

3   packaged in a white squeeze-tube whose cap is at its base.[140] GLOW lotion is packaged in a silver

4   cylindrical bottle with a black dispenser top, while GLOW BY J.LO lotion is sold in a tube that is

5   identical to that used for GLOW BY J.LO shower gel.[141]

6       The GLOW mark is printed in lowercase courier-type font on all Glow, Inc. products. The

7   overall look is clean and suggestive of a label prepared by a typewriter. The labels employ a

8   standardized format – the GLOW mark is placed at the top of the label; two sets of double lines

9   frame the individual product name in the center; and the words "los angeles" are printed below

10  the second set of double lines.

11      The packaging of GLOW BY J.LO products is more elaborate and not as uniform. The word

12  "Glow" appears on all GLOW BY J.LO products in a non-courier font, with the "G" capitalized.

13  "Glow" is printed in orange on defendants' shower gel and lotion containers, while "J.Lo" is

14  printed in silver, using the distinctive lowercase font and lettering that have come to be associated

15  with Lopez. Defendants' eau de toilette bottle features the GLOW BY J.LO mark in a non-courier

16  font around the bottle's cap, while a pendant "J.Lo," printed in the distinctive typeface associated

17  with Lopez, hangs from strands around the bottle – giving the illusion of a necklace encrusted in

18  diamonds or rhinestones. The box for the shower gel, lotion and eau de toilette bears the GLOW

19  BY J.LO mark. The word "Glow" is printed in an orange, non-courier font, while "J.Lo" is

20  printed in lowercase, silver, hammersmith letters. "J.Lo" is also printed in beige letters of the

21  same font that descend in a diagonal pattern down the box front.[142]

22      "Different packaging, coloring, and labeling can be significant factors in determining

23

24  _____

25  [139]*Id.*, Ex. 47 (GLOW BY J.LO eau de toilette bottle and box).

26  [140]Williamson Reply Decl., Ex. U (GLOW and GLOW BY J.LO shower gel bottles).

27  [141]*Id.* (GLOW and GLOW BY J.LO lotion bottles).

28  [142]Walsh Decl., Exs. 47-48; Williamson Reply Decl., Exs. S, U.

1   whether there is a likelihood of confusion." *Packman v. Chicago Tribune Co.*, 267 F.3d 628,

2   644 (7th Cir. 2001).  See also *Nabisco, Inc. v. Warner-Lambert Co.*, 220 F.3d 43, 47 (2d Cir.

3   2000) ("Our inquiry does not end with a comparison of the marks themselves.  Rather, in

4   determining whether two marks are confusingly similar, we must 'appraise the overall impression

5   created by . . . the context in which they are found and consider the totality of factors that could

6   cause confusion among prospective purchasers'"); *Streetwise Maps, Inc. v. Vandam, Inc.*, 159

7   F.3d 739, 744 (2d Cir. 1998) ("In determining whether the two marks are similar, and therefore

8   likely to provoke confusion among prospective purchasers, courts appraise 'the overall impression

9   created by the logos and the context in which they are found and consider the totality of factors

10   that could cause confusion among prospective purchasers,'" quoting *Gruner + Jahr USA*

11   *Publishing v. Meredith Corp.*, 991 F.2d 1072, 1075 (2d Cir. 1993)); *Heartsprings, Inc. v.*

12   *Heartspring, Inc.*, 143 F.3d 550, 554 (10th Cir. 1998) ("Even if the trade names are similar, the

13   likelihood of confusion is reduced if the two trademarks, taken as a whole, are visually distinct").

14        Here, as noted, the packaging used by plaintiff and defendants for their fragrance products

15   is quite different, and tends to minimize any confusion generated by the similarity in  the sound

16   and meaning of the trademarks.  The packaging used for the shower gel and lotion products is

17   more generic, and therefore less distinct.  GLOW BY J.LO products are packaged in squeeze tubes,

18   while GLOW products are offered in cylindrical bottles.  Both containers are relatively common

19   for the type of cosmetic products involved.  The packaging is nonetheless different, however, as

20   is the presentation of the marks on the product labels and the boxes in which the products are

21   placed.   The manner in which the products are presented in the marketplace accordingly

22   minimizes the likelihood that consumers will conclude they emanate from the same source.  For

23   this reason, the court concludes that, in commercial context, the marks are not visually similar,

24   and that this factor weighs against a finding that Glow, Inc. will be able to prove likelihood of

25   confusion.  See *Nabisco, supra,* 220 F.3d at 47-48 (holding that the presentation of competing

26   marks "in starkly different typefaces and styles," as well as differences in the shape, dimensions

27   and color patterns of product packages gave rise to "distinctly different commercial impressions"

28   and negated any likelihood of consumer confusion); *Walter, supra,* 210 F.3d at 1111 (holding,

1   in a reverse confusion case, that "[t]he appearance of the respective marks . . . negates any
2   similarity. Occasionally, in Walter's materials, the term 'Pearl Beach' appeared in plain font
3   either above or below a monochromatic, stylized scallop shell with a pearl at the center of the
4   shell. In contrast, Mattel's packaging depicts a bright pink radial sculpture clamshell tilted to one
5   side with the words 'Pearl Beach' in wavy, sandy-textured script with glittery accents over the
6   name 'Barbie' (or 'Friend of Barbie'). The term 'Pearl Beach' in Mattel's products never appears
7   alone; rather, it is invariably accompanied by a reference to Barbie, which is clearly the 'salient
8   part of the mark indicative of the product's origin.' . . . In other words, 'Barbie' is the dominant
9   part of the 'Pearl Beach Barbie' mark. Accordingly, the district court correctly concluded that
10  plaintiff's own distinctive logo is not similar in appearance to Mattel's packaging of its Pearl
11  Beach products"); *Luigino's, Inc. v. Stouffer Corp.*, 170 F.3d 827, 831 (8th Cir. 1999)
12  (considering, *inter alia*, the fact that "[t]he trade dress of the two [parties'] packages [was] . . .
13  visually distinct," with "different colors and typefaces," in concluding that MICHELINA'S LEAN
14  'N TASTY was not confusingly similar to STOUFFER'S LEAN CUISINE as a matter of law);
15  *Streetwise Maps, supra,* 159 F.3d at 744-45 ("Several key distinctions may be observed between
16  the products themselves and the overall impression created by the marks that would lead
17  consumers to believe the products originated from different companies. For example, although
18  the two maps are similar in size, they have different folds (VanDam's triple gate unfold versus
19  Streetwise's accordion unfold), different logos (e.g., VanDam, Inc.'s use of the large NYC and
20  Lady Liberty logos), and different dress colors and typefaces. Further, while Streetwise appears
21  as one word, StreetSmart, because of its color scheme, appears as two separate words. Moreover,
22  while the mark 'StreetSmart' stands by itself and encompasses roughly one-twelfth of the cover,
23  'Streetwise' appears together with 'Manhattan' and uses one-third of the cover's space. Hence,
24  in our view the marks are not confusingly similar"); *Estee Lauder, supra,* 108 F.3d at (citing
25  1512 (citing, *inter alia,* "the facts that the rendering of '100%' in the two sets of marks is different
26  in appearance [and]  that the appearance of the packaging overall is quite different in graphic
27  design," in holding that there was no likelihood of consumer confusion as a matter of law);
28  *W.W.W. Pharm. Co. v. Gillette Co.*, 984 F.2d 567, 573 (2d Cir. 1993) ("Although the marks are

composed of the same words and sound the same when uttered, several factors distinguish them. First, WWW's mark appears as one word and is the only identifier of the product. On Gillette's product, however, the words 'sport' and 'stick' are preceded in larger letters by the well-known brand name 'Right Guard.' . . . The words 'sport' and 'stick' are about one-third the size of the Right Guard logo and the same size as the word 'deodorant' or 'deodorant anti-perspirant.' The district court found that the diminutive size of the words 'sport' and 'stick' was true for most of Gillette's advertising.  In addition, Gillette's 'sport' and 'stick' are separated by a running figure.  The dissimilar modes of presentation make confusion less likely"); *Lang v. Retirement Living Publishing Co.*, 949 F.2d 576, 581-82 (2d Cir. 1991) ("Both designations include as their focal point the words 'New Choices.'  However, Lang's name always includes the word 'Press,' whereas Retirement Living's mark always includes the words 'For The Best Years.'  The typeface also serves to distinguish the two designations, as does the location of the designations on the products. . . .  As such, the general impression conveyed to the public by these designations differs significantly, and therefore we agree with the district court that the similarities do not create an issue of fact on the likelihood of consumer confusion"); *Lindy Pen Co. v. Bic Pen Co.*, 725 F.2d 1240, 1245 (9th Cir. 1984) ("Overwhelming evidence at trial established that the Lindy and Bic pens and all packaging, display and promotional materials were dissimilar in appearance and readily distinguishable.  The trial court further found that the trademarks 'BIC' and LINDY' were prominently and repeatedly displayed on the pens and all packaging and promotional materials.  The trial court therefore concluded that the two marks, Lindy's 'Auditor's' and Bic's 'Auditor's fine point,' considered in the context in which they appeared in the marketplace, were not confusingly similar"), cert. denied, 469 U.S. 1188 (1985).[143]

---

[143]Glow, Inc. argues that such differences are not controlling, as defendants have advertised GLOW BY J.Lo in a way that emphasizes "glow" and de-emphasizes the products' connection with Lopez or "J.Lo."  The advertisements proffered for the court's consideration utilize the phrase "It's the Glow . . . The New Fragrance by Jennifer Lopez."  "Glow" is printed in significantly larger type than "The New Fragrance by Jennifer Lopez."  Additionally, it is orange, while the balance of the text is black.  The ad, therefore, focuses the reader's attention on "Glow," and divorces it from references to Lopez.  Defendants assert they have adopted "guidelines" for GLOW

1          **d.    Evidence Of Actual Confusion**

2          Evidence of actual confusion is not necessary to prevail on an infringement claim or to

3   secure injunctive relief.  See *Academy of Motion Picture Arts & Sciences v. Creative House*

4   *Promotions, Inc.*, 944 F.2d 1446, 1456 (9th Cir. 1991) ("actual confusion is not necessary to a

5   finding of likelihood of confusion under the Lanham Act"); *Levi Strauss, supra*, 778 F.2d at 1360

6   ("The absence of evidence of actual confusion need not give rise to an inference of no likelihood

7   of confusion"); *Golden Door, Inc. v. Odisho*, 646 F.2d 347, 352 (9th Cir. 1990)  (affirming the

8   grant of an injunction for plaintiff despite the absence of evidence of actual consumer confusion).

9   Proof of actual confusion, however, "is persuasive proof that future confusion is likely."

10  *Sleekcraft, supra*, 599 F.2d at 352.  See also *Rodeo Collection, Ltd. v. West Seventh*, 812 F.2d

11  1215, 1218 (9th Cir. 1987) ("Evidence of actual confusion is strong evidence of likelihood of

12  confusion, but it is not determinative"); *World Carpets, Inc. v. Dick Littrell's New World Carpets*,

13  438 F.2d 482, 489 (5th Cir. 1971) ("[t]here can be no more positive or substantial proof of the

14  likelihood of confusion than proof of actual confusion.  Moreover, reason tells us that while very

15  little proof of actual confusion would be necessary to prove the likelihood of confusion, an almost

16  overwhelming amount of proof would be necessary to refute such proof"); *Dominion Bankshares*

17  *Corp. v. Devon Holding Co., Inc.*, 690 F. Supp. 338, 347 (E.D. Pa. 1988) ("[a]ctual confusion

18  is one of the most reliable indications of the likelihood of confusion"); *Jockey Int'l, Inc. v.*

19  *Burkard*, 185 U.S.P.Q. 201, 207 (S.D. Cal. 1975) ("[s]ince reliable evidence of actual confusion

20

21  BY J.LO advertising that will minimize any possible consumer confusion in the future.  Defendants
22  do not specify what these guidelines are; presumably, however, they relate to the matters plaintiff
    has highlighted.  Despite defendants' representation, Glow, Inc. proffers evidence that at least one
23  print advertisement currently in circulation continues to use the offending phrase, coloring and
    typeface. (Williamson Reply Decl., Ex. S.)  It also proffers evidence that a current television
24  advertisement focuses viewer attention on the "glow" portion of mark through verbal repetition
    of the phrase "Get the Glow," followed by visual display and verbal repetition of the product
25  name GLOW BY J.LO.  (*Id.*, Ex. T.)  Were Glow, Inc.'s showing on the protectability of its mark
26  and the other elements of likelihood of confusion stronger, the court might consider addressing
    this issue by issuing a limited injunction precluding use of the offending phrase in advertisements.
27  Because Glow, Inc. has not demonstrated a likelihood that it will prove it has a protectable mark,
28  however, the court does not reach the issue at this time.

1 | is difficult to obtain in trademark infringement cases, any such evidence is substantial evidence
2 | that confusion is likely").

3 |      At least three types of evidence are probative of confusion: (1) evidence of actual instances
4 | of confusion; (2) survey evidence; and (3) inferences arising from judicial comparison of the
5 | conflicting marks and the context of their use in the marketplace. *Cairns v. Franklin Mint Co.,*
6 | 24 F. Supp. 2d 1013, 1040 (C.D. Cal. 1998) (quoting *Dr. Seuss Enterprises, L.P. v. Penguin*
7 | *Books USA, Inc.,* 109 F.3d 1394, 1404 (9th Cir. 1997). Glow, Inc. has not produced a consumer
8 | survey. Cf. *Anti-Monopoly, Inc. v. General Mills Fun Group, Inc.,* 684 F.2d 1316, 1323 (9th
9 | Cir.1982) (holding that consumer surveys are legitimate evidence in trademark cases). Rather,
10 | it has produced two facsimiles from a wholesale customer and the handwritten notes of employees
11 | who recorded comments made by retail customers.[144] While this constitutes some evidence of
12 | actual reverse confusion, it is not sufficient to support a general likelihood of confusion finding.
13 | See *Platinum Home Mortgage Corp. v. Platinum Financial Group, Inc.,* 149 F.3d 722, 729 (7th
14 | Cir. 1998) ("[D]e minimus evidence of actual confusion" does not establish a likelihood of
15 | consumer confusion, and the evidence presented must "refer to the confusion of reasonable and
16 | prudent consumers, . . . not confusion among sophisticated members" of the consuming public").
17 | Compare *Chronicle Pub. Co. v. Chronicle Publications, Inc.,* 733 F. Supp. 1371, 1377-78 (N.D.
18 | Cal. 1990) ("Plaintiff has provided substantial evidence of actual confusion in the form of over
19 | 100 instances of customer confusion. These include book wholesalers requesting copies of
20 | defendant's publications from plaintiff, retailers and wholesalers attempting to return unused
21 | copies of defendant's books to plaintiff, bills for defendant's advertising being sent to plaintiff and
22 | congratulations on defendant's sales figures being conveyed to plaintiff. . . . This constitutes
23 | substantial evidence of actual confusion and weighs heavily in favor of plaintiff"). Here, at most,
24 | Glow, Inc. present de minimis evidence of actual confusion; some of it, moreover, involves
25 | "sophisticated" wholesalers who might be expected to inquire about the affiliation, if any,
26 | between the companies.

27

28 |     [144]Williamson Decl., ¶ 12, Ex. E.

1    Williamson's testimony that department stores and Glow, Inc.'s investor group have tabled

2    plans for expansion of the product line does not indicate consumer confusion, but business caution

3    in the face of uncertain market competition.[145]   Accordingly, this *Sleekcraft* factor does not favor

4    a finding that Glow, Inc. will be able to prove a likelihood of consumer confusion.

5              e.      **The Degree To Which The Marketing Channels Converge And The**

6                      **Likelihood That The Product Lines Will Expand**

7              Glow, Inc. asserts that the parties utilize the same marketing channels because:

8    (1) "Macy's and Nordstrom are often located side by side under the same roof in shopping

9    malls;" (2) "Both products are additionally sold in specialty stores which may also appear side

10   by side;" and (3) "The products are also sold side by side on the Internet."[146]

11             The marketing channels factor requires that the court consider whether the predominant

12   purchasers of the parties' goods are similar or different, and whether the marketing approaches

13   used resemble each other.  See *Gray v. Meijer, Inc.*, 295 F.3d 641, 649 (6th Cir. 2002).  See also

14   *Frehling Enterprises, Inc. v. International Select Group, Inc.*, 192 F.3d 1330, 1339 (11th Cir.

15   1999) ("'Dissimilarities between the retail outlets for and the predominant customers of plaintiff's

16   and defendant's goods lessen the possibility of confusion, mistake, or deception.' . . . This factor

17   takes into consideration where, how, and to whom the parties' products are sold," quoting *Amstar*

18   *Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 262 (5th Cir.), cert. denied, 449 U.S. 899 (1980)).

19   Direct competition between the parties' products is not required for this factor to weigh in favor

20   of a likelihood of confusion.  Similarly, the parties' outlets and customer bases need not be

21   identical; rather, some degree of overlap must be present before the factor favors a finding of

22   likelihood of confusion.  *Frehling Enterprises, supra*, 192 F.3d at 1339.   See also *Century 21*

23   *Real Estate Corp. v. Century Life of America*, 970 F.2d 874, 877 (Fed. Cir. 1992) ("An opposer

24   need not establish the sale of both parties' services by the same vendor to show employment of

25   the same trade channels. . . .   Rather, this factor covers 'similarity and dissimilarity of

26   _____

27        [145]*Id.*, ¶¶ 7-8; Williamson Reply Decl., ¶¶ 3, 14.

28        [146]Pl.'s Reply at 10:8-11.

1   established, likely-to-continue trade channels.' . . . This court does not limit channels of trade

2   to identical stores or agents. Rather a channel of trade includes the same type of distribution

3   channel. For example, this court has held channels of trade identical when products were sold

4   under opposing marks in supermarkets and grocery stores across the country. . . . An opposer

5   does not have the burden to show sales of an infringing product by a specific chain of

6   supermarkets or agents").

7        Here, both Glow, Inc. and defendants offer products for sale in upscale department stores

8   such as Nordstrom's and Macy's. They also place their products in specialty stores that cater to

9   high-end retail customers. This is sufficient to support a finding that they use similar marketing

10  channels. This finding is reinforced when one considers that both companies offer their products

11  for sale over the internet. See, e.g., *Brookfield Communications, supra*, 174 F.3d at1057

12  (holding that the companies used similar marketing channels because of their "simultaneous use

13  of the Web as a marketing and advertising tool"). Accordingly, the court finds that this factor

14  favors the conclusion that Glow, Inc. will probably be able to establish a likelihood of consumer

15  confusion.[147]

16       Glow, Inc. also asserts that both it and defendants intend to expand their respective product

17  lines and the markets in which they sell. The evidence before the court indicates that defendants

18  have some intention of expanding beyond the lotion, shower gel and fragrance products they

19  ─────────────

20  [147]It is in analyzing whether the parties use similar marketing channels that defendants'
    argument regarding the differences between "mass marketed" fragrances and natural,
21  aromatherapy products may be most pertinent. See 4 J. Thomas McCarthy, MCCARTHY ON
    TRADEMARKS AND UNFAIR COMPETITION, § 24:51 (4th ed. 2002) (discussing the *Sunenblick* case
22  in this context). As noted earlier, however, the record contains no evidence that purchasers of
    "mass marketed" fragrances or lotions do not also buy natural, aromatherapy products. Given
23  this fact, and the fact that the products are sold in the same types of stores and are used for the
    same purposes, there is no basis for a finding that the audience for one type of product is
24  completely distinct from the audience for the other. See *Clinique Laboratories, Inc. v. Dep
25  Corp.*, 945 F. Supp. 547, 554-55 (S.D.N.Y. 1996) (noting that, because of "cross-shopping,"
    no significant line could be drawn insulating those who shopped for plaintiff's skin care products
26  in "class" department and specialty stores from those who shopped for defendant's competing
27  product at "mass" discount retailers, and concluding, based on "the evidence of cross-shopping
    and advertising," that "the 'mass' and 'class' markets are not truly distinct").

28

56

1  currently sell to other types of cosmetics.   Williamson has been attempting to negotiate

2  distribution arrangements with a number of department and speciality stores.   It appears,

3  therefore, that there is the potential for even more direct competition between the two lines in the

4  future.   The "likelihood of expansion" factor thus favors a likelihood of confusion finding as

5  well.

6          **f.**    **Degree Of Care Exercised By Consumers**

7        Neither party has proffered evidence regarding the care exercised by consumers in

8  purchasing products such as skin lotion, shower gel and fragrance.   Courts have previously

9  recognized, however, that purchasers of fragrances and skin care products tend to exercise a high

10  degree of care and brand consciousness.   See *Lucien Lelong, Inc. v. Lenel, Inc.*, 181 F.2d 3, 4

11  (5th Cir. 1950) ("The pronunciation of these names might bring about a sounding of similarity;

12  but buyers of [cologne] are meticulous and do not depend solely on pronunciation"); *La Cibeles,*

13  *Inc. v. Adipar, Ltd.*, No. 99 Civ.4129(AGS), 2000 WL 1253240 (S.D.N.Y. Sept. 1, 2000)

14  ("Additionally, 'it has been acknowledged that women tend to be sophisticated purchasers of

15  perfume'"); *Conopco, Inc. v. Cosmair, Inc.*, 49 F. Supp. 2d 242, 257 (S.D.N.Y. 1999) ("There

16  is ample evidence in the record that the purchasers of expensive perfumes from high-end

17  department and specialty stores, who are often assisted by retail selling specialists and beauty

18  advisors, . . . are sophisticated and discriminating consumers. . . . Other Courts faced with this

19  question have reached the same result"); *Clinique, supra*, 945 F. Supp. at 556 ("The evidence

20  shows that most consumers of skin care products are women  (and the products at issue are

21  marketed to women), who take care in deciding what products to use on their skin, particularly

22  the skin on their faces.  While Clinique's products are not extravagantly priced, they are sold in

23  high quality department stores.   Under these circumstances, sophistication of consumers usually

24  militates against a finding of likelihood of confusion"); *Giorgio Beverly Hills, supra*, 869 F. Supp.

25  at 185 ("it has been acknowledged that women tend to be sophisticated purchasers of perfume");

26  *Edison Bros. Stores v. Cosmair, Inc.*, 651 F. Supp. 1547, 1651-52 (S.D.N.Y. 1987) (holding that

27  purchasers of perfumes "are likely to devote a high degree of care and attention to their

28  selection");   *Nina Ricci, SARL v. Gemcraft, Ltd.*, 612 F. Supp. 1520, 1529 (S.D.N.Y. 1985)

1 ("Women who use expensive perfumes are sophisticated and discriminating customers"); *P.F.*

2 *Cosmetique SA v. Minnetonka, Inc.*, 605 F. Supp. 662, 671 (S.D.N.Y. 1985) (concluding that

3 purchasers of top-of-the-line beauty products in roughly similar product packaging often

4 distinguish between products that share a number of common elements); *Jean Patou, Inc. v.*

5 *Jacqueline Cochran, Inc.*, 201 F. Supp. 861, 866 (S.D.N.Y. 1962) ("The women who buy

6 plaintiff's and defendant's products are apt to make an individual choice. There is a vast array

7 of cosmetics on the market varying greatly in price and in the claims made by their producers.

8 The products are not all alike; their potential customers realize this, and tend to be selective"),

9 aff'd., 312 F.2d 125 (2d Cir. 1963).  See also *Frances Rothschild, Inc. v. U.S. Cosmetic*

10 *Fragrance Marketing Corp.*, 223 U.S.P.Q. 817, 818 (N.D. Tex. 1983) ("Retailers' utilization

11 of 'demonstrators' (trained sales persons) in the sale of men's fragrance products helps inform

12 customers of the differences in the products").

13    Glow, Inc. argues that such products are also commonly purchased on impulse or as gifts.

14 See *Elizabeth Taylor Cosmetics*, *supra*, 673 F.Supp. at 1246 ("[T]here are really two groups of

15 perfume consumers: women who buy the products for themselves and men who buy it as gifts for

16 women.  In general, women are sophisticated fragrance consumers: 'They know their perfume.'

17 Men, however, tend to be less sophisticated.  All buyers may be slightly less sophisticated in this

18 case, because Taylor's product is relatively new and Goutal's sales have only recently become at

19 all substantial.  Nevertheless, assuming more women buy perfume than men, this factor weighs

20 slightly in Taylor's favor" (citations omitted)).  While there are no doubt some impulse and gift

21 purchases, the court finds, on balance, that this factor favors defendants, and undercuts plaintiff's

22 ability to demonstrate that it will probably prove a likelihood of consumer confusion.

23            **g.    Defendants' Intent In Adopting The Mark**

24    Knowing adoption of a mark closely similar to another is a sound basis for inferring an

25 intent to deceive. See, e.g., *Official Airline Guides*, *supra*, 6 F.3d at 1394 ("[w]hen an alleged

26 infringer knowingly adopts a mark similar to another's, courts will presume an intent to deceive

27 the public"). See also *Daddy's Junky Music Stores, Inc., v. Big Daddy's Family Music Ctr.*, 109

28 F.3d 275, 286 (6th Cir. 1997) ("the use of a contested mark with knowledge of the protected

1  mark at issue can support a finding of intentional copying"); 3 J. McCarthy, TRADEMARKS AND

2  UNFAIR COMPETITION, § 23:115 (4th ed. 2002) ("[i]f a well-known and strong mark has been

3  used in identical format by a junior user, it appears reasonable to require the junior user to carry

4  the burden of explanation and persuasion as to his motive in adopting the mark"). Generally, in

5  the reverse confusion context, it is not likely that there will be evidence defendant intended to

6  adopt the senior user's mark. See *A & H Sportswear, supra,* 237 F.3d at 232. Where there is,

7  however, the factor is evaluated in the same manner as in a direct confusion case. *Id.*

8      Glow, Inc. proffers evidence that a gift basket of GLOW products was delivered to Lopez

9  in 2001.[148] It also adduces evidence that the producer of a television show featuring Lopez's sister

10 knew of the GLOW mark, and requested plaintiff's permission to use the mark in a September

11 2001 episode.[149] Defendants assert this is insufficient, without more, to support an inference of

12 intentional copying. The court agrees. The inference plaintiff would have the court draw is far

13 too attenuated, particularly given the number of beauty products in the market that utilize the term

14 "glow." This factor, therefore, weighs against a finding that Glow, Inc. will probably be able

15 to prove a likelihood of consumer confusion.

16                          **3.    Evaluation Of The Factors**

17     Having examined the *Sleekcraft* factors, the court finds it is likely that three will favor

18 Glow, Inc., and five will favor defendants. As noted earlier, however, the factors should not be

19 applied mechanistically, but as a guide in assessing likelihood of confusion. See *Dreamwerks,*

20 *supra,* 142 F.3d at 1129; *E. & J. Gallo Winery, supra,* 967 F.2d at 1290. In reverse confusion

21 cases such as this one, the strength of the mark, the relatedness of the parties' goods, and the

22 similarity of the marks are particularly relevant. See *Dreamwerks, supra,* 142 F.3d at 1130.

23 With these principles in mind, the court concludes it is not likely that Glow, Inc. will ultimately

24 prove a likelihood of consumer confusion. While the court has found that Glow, Inc. will likely

25 be able to prove that the goods the parties sell are related, it has also found that the conceptual

26 _____

27     [148]Williamson Decl., ¶ 10, Ex. D.

28     [149]Williamson Reply Decl., ¶ 25.

1   strength of Glow, Inc.'s mark is relatively weak, that numerous cosmetic companies utilize the

2   mark in some fashion in connection with the sale of lotion and fragrance products, and because

3   of these facts, it is not apparent that consumers will associate plaintiff's products with GLOW BY

4   J.LO despite defendants' commercial strength and advertising expenditures.  Coupled with the fact

5   that consumers of fragrance and skin care products tend to exercise care in making their

6   selections, the minimal evidence of actual confusion, and the absence of evidence of intent, Glow,

7   Inc. has not demonstrated that it will probably prove a likelihood of consumer confusion.  Because

8   it also has not established that it will likely prove it is the owner of a protectable mark, the court

9   concludes it has not demonstrated a likelihood of success on the merits of its trademark

10  infringement claim.

11      C.      **Irreparable Harm/Balance Of Hardships**

12          Where a party demonstrates a likelihood of succeeding on a trademark infringement claim,

13  irreparable harm is presumed.  See *Genessee Brewing Co. v. Stroh Brewing Co.*, 124 F.3d 137,

14  142 (2d Cir. 1997) (holding that this was true for an unregistered trademark and stating that a

15  "showing of likelihood of confusion (a requirement of both trademark infringement and unfair

16  competition claims) establishes irreparable harm"); *International Jensen, Inc v. Metrosound*

17  *U.S.A., Inc.*, 4 F.3d 819, 826 (9th Cir. 1993) ("In trademark cases, once the plaintiff establishes

18  a likelihood of confusion between the plaintiff's mark and the defendant's, it is ordinarily

19  presumed the plaintiff will suffer irreparable harm if injunctive relief is not granted"); *Metro*

20  *Pub., Ltd. v. San Jose Mercury News*, 987 F.2d 637, 640 (9th Cir. 1993) (likelihood of confusion

21  establishes irreparable harm as respects the unauthorized use of an unregistered trademark);

22  *Processed Plastic Co. v. Warner Communications, Inc.*, 675 F.2d 852, 858 (7th Cir. 1982)

23  ("damages occasioned by trademark infringement are by their very nature irreparable and not

24  susceptible of adequate measurement for remedy at law"); *Teletech Customer Care Management,*

25  *Inc. v. Teletech Co.*, 977 F. Supp. 1407, 1412 (C.D. Cal. 1997) (enjoining a defendant that was

26  using plaintiff's corporate name as a domain name, the court noted that "there is always

27  irreparable injury when trademark infringement exists," citing *Dep Corporation v. Opti-Ray, Inc.*,

28  768 F. Supp. 710, 717 (C.D. Cal. 1991)).  See also 15 U.S.C. § 1116 (an injunction is an

1   available remedy for trademark infringement or violation of § 43(a)).  Because Glow, Inc. has

2   not demonstrated a likelihood of success, irreparable harm may not be presumed.

3          The court may also issue an injunction, however, if it finds that there are "serious

4   questions" going to the merits of the claim, and that the balance of hardships tips "sharply" in the

5   movant's favor.  *Id.*  "In evaluating the balance of hardships a court must consider the impact

6   granting or denying a motion for a preliminary injunction will have on the respective enterprises."

7   *International Jensen, supra*, 4 F.3d at 826.  Glow, Inc. has presented no evidence that it has

8   suffered, or will suffer, irreparable harm due to defendants' actions.  Williamson asserts that

9   potential wholesalers of Glow, Inc. products have advised her that they will not make purchasers

10  until this case is resolved.  Similarly, some of the investors with whom Williamson has been

11  negotiating have declined to continue the discussions until the litigation is concluded.  Williamson

12  proffers no evidence, however, that Glow, Inc.'s current wholesalers or business outlets have

13  been affected by the launch of defendants' products.  Nor does she contend that her business

14  cannot survive the launch of defendants' product line, or that her existing market or goodwill will

15  be impacted.[150]  See *Kaisha v. Swiss Watch International, Inc.*, 188 F. Supp. 2d 1350, 1355 (S.D.

16  Fla. 2002) (stating, in a case where the court did not find a substantial likelihood of confusion,

17  that the showing of irreparable harm was inadequate because "the threat to Plaintiff's goodwill

18  and reputation is minimal, and . . . Plaintiff may be compensated sufficiently with monetary

19  _____

20      [150]At the preliminary injunction hearing, Glow, Inc.'s counsel requested an opportunity to
    supplement the record, and provide additional evidence of the harm the company will suffer if an
21  injunction does not issue.  After consideration, the court denies plaintiff's request.  Glow, Inc.
    has had sufficient opportunity to proffer evidence demonstrating that it will suffer harm if an
22  injunction does not issue in this case.  Despite the fact that it bears the burden of proof in this
    proceeding, it submitted minimal evidence supporting its request for injunctive relief at the time
23  it filed its moving papers.  The majority of the evidence and legal argument on which it relies was
    contained in its reply to defendants' opposition.  Submitting the bulk of one's legal argument and
24  evidence only in reply deprives the opposing party of a fair opportunity to respond, and
    contravenes the Local Rules.  See CA CD L.R. 7-5 (moving party shall include a complete
25  statement of its legal arguments and the evidence on which it relies in its moving papers).  To
26  permit plaintiff to supplement the record further at this stage of the proceedings in order to correct
    deficiencies in the original showing would simply prejudice defendants further and reward
27  plaintiff's questionable litigation strategy.  This court declines to do.
28

1   damages").  Cf.  *Rent-A-Center v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597,

2   603 (9th Cir. 1991) (intangible injuries, such as damage to goodwill, qualify as irreparable harm).

3   Glow, Inc. asserts that defendants' continued sale and advertising of GLOW BY J.LO products will

4   disrupt its relationship with wholesalers, who will refuse to carry GLOW products because they

5   perceive them to be a "knock off" of defendants' line.[151]  No evidence in the record supports this

6   assertion, however, and the court cannot simply assume that it is true.

7        As respects the harm that they would suffer if an injunction were to issue, defendants

8   contend that they have invested $29.5 million to date in manufacturing, advertising, marketing

9   and promoting GLOW BY J.LO products.[152]  They assert that a four to six month delay would occur

10  if they were required to change their product packaging, and speculate that as much as $13 million

11  in sales could be lost during that time.[153]  They also maintain that the success rate for new

12  fragrances is low, even with a constant brand presence and strong advertising support.[154]  Glow,

13  Inc. aptly notes that defendants were warned against using the mark before they launched the

14  GLOW BY J.LO line.[155]  Even discounting defendants' showing of potential harm, however, and

15  assuming *arguendo* that plaintiff has raised serious questions regarding the merits of its claim, the

16  court cannot find that the balance of hardships tips sharply in Glow, Inc.'s favor.  Accordingly,

17  it cannot grant injunctive relief under the alternate formulation recognized in Ninth Circuit case

18  law.[156]

19  _____

20      [151]Pl.'s Reply at 12:21-23.

21      [152]Walsh Decl., ¶ 26.

22      [153]*Id.*, ¶ 27.

23      [154]*Id.*, ¶ 31.

24      [155]Pl.'s Reply at 12:7-12.

25      [156]Because Glow, Inc. has not demonstrated that it is likely to prove it has protectable

26  rights in the GLOW trademark, the court assesses the public interest factor as neutral on the present

27  record. See, e.g., *AM General Corp. v. DaimlerChrysler Corp.*, _ F.3d _, 2002 WL 31545350
    (7th Cir. Nov. 18, 2002) ("The public interest favors the injunction, DaimlerChrysler contends,

28  because the enforcement of trademark laws protects consumers from confusion"); *Eli Lilly & Co.*

1

### III.   CONCLUSION

2    For the forgoing reasons, plaintiffs' motion for a preliminary injunction is denied.

3

4    DATED: December 13, 2002

                            MARGARET M. MORROW

5                              UNITED STATES DISTRICT JUDGE

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*v. Natural Answers, Inc.*, 233 F.3d 456, 469 (7th Cir. 2000) (". . . the public interest is served by the injunction because enforcement of the trademark laws prevents consumer confusion").